[Civ. No. 28347. Fourth Dist., Div. One. Oct. 21, 1983.]

HAROLD MILLER et al., Plaintiffs and Appellants, v.
MARION J. WOODS, as Director, etc., Defendant and Appellant.

[Civ. No. 28164. Fourth Dist., Div. One. Oct. 21, 1983.]

COMMUNITY SERVICES CENTER FOR THE DISABLED et al.,
Plaintiffs and Appellants, v.
MARION J. WOODS, as Director, etc., et al.,
Defendants and Respondents.

864

## Counsel

Colleen Fahey Fearn, Charles Wolfinger, Geis & Wolfinger, Marilyn Holle, Dan Brzovic and Elena H. Ackel for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Willard A. Shank, Chief Assistant Attorney General, Thomas E. Warriner, Assistant Attorney General, and John W. Spittler, Deputy Attorney General, for Defendant and Appellant and Defendants and Respondents.

**OPINION**

**STANIFORTH, J.**—Plaintiffs[1] challenge the validity of a regulation (Department of Social Services Manual of Policies and Procedures § 30-463.233c) (MPP) issued by the Director, State Department of Social Services (Department), which denies payment to "housemates" for "protective supervision" services rendered to totally disabled persons.[2] This result is compelled by the Department's regulation which in effect volunteers the service of live-in housemates with a few, narrowly limited, exceptions.

The challenged regulation provides: "For service authorization purposes, *no need for protective supervision exists when a housemate is in the home,* unless the housemate who is present falls in one or more of categories 1, 2, or 3 listed in .235 b below, or if the housemate is the landlord or tenant of the recipient or if the housemate is a parent under the circumstances specified in .245." (MPP § 30-463.233c.)

The trial court held this regulation invalid but granted the relief sought only to the individual plaintiffs who sought writs of mandate. Despite finding the regulation invalid the trial court denied any relief to the six organizations' motions for class certification and for summary judgment. The trial court reasoned the Department would appeal and thereby obtain an appellate court decision which, if adverse, would be voluntarily extended by the Department to the entire class.

I

THE LEGISLATIVE SCHEME

In 1973 the Legislature enacted the In-Home Supportive Services (IHSS) program to enable aged, blind or disabled poor to avoid institutionalization by remaining in their homes with proper supportive services. (Welf. & Inst. Code, § 12300, and as amended, Stats. 1981, ch. 69, § 16.)[3] *To be eligible for IHSS services, a person must be poor and either over 62, blind or disabled, and unable to perform the routine daily tasks of caring for himself.*

---

[1]Harold and Josephine Miller, plaintiffs in 4 Civ. 28347, moved to consolidate this appeal with 4 Civ. 28164. The plaintiffs in 4 Civ. 28164 are six organizations interested in the rights of disabled persons plus two individual plaintiffs. The actions are joined for all purposes on this appeal.

[2]Protective supervision services are "for monitoring the behavior of nonself-directing, confused, mentally impaired or mentally ill persons . . . ." (MPP § 30-457.7.71.) Such services consist of "observing recipient behavior in order to safeguard the recipient against injury, hazard or accident." (MPP § 30.457.7.)

[3]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

(§ 12500.) IHSS programs must enable the recipient to remain in his own home or abode of his choosing. (§ 12300.)

The Department and its director are responsible for administering the IHSS program in compliance with state and federal laws.[4] (§§ 10600, 10553, 12301, 12301.1, 12302.) The Department promulgates regulations to implement the statutes (§§ 10553, subd. (c), 10604, subd. (b), 12301.1) while the county welfare departments administer the program under the state's general supervision. The county departments process applications for IHSS assistance (MPP §§ 30-009, 30-455, 30-459), determine the individual's needs and authorize services. (MPP § 30-463.1.) The county either obtains and pays the provider or pays the recipient who hires one. (MPP §§ 30-464, 30-467.) Determinations are reviewable at a fair hearing before the state Department at the recipient's or provider's request. (§ 10950.)

The Legislature authorized a broad range of support services to eligible persons. Section 12300 provides: "[D]omestic services and services related to domestic services, heavy cleaning, nonmedical personal services, accompaniment by a provider when needed during necessary travel to health related appointments or to alternative resource sites and other essential transportation as determined by the director, yard hazard abatement, *protective supervision,* teaching and demonstration directed at reducing the need for other supportive services, paramedical services, and other services as determined by the director *which make it possible for the recipient to live in comfort and safety under an independent living arrangement.*" (Italics added.)

The type and amount of service are determined on an individual basis. (MPP § 30-475.3.) The total cost for services authorized to any individual is limited by a monthly *maximum* benefit. For severely impaired persons, the sum is $838 (§ 12304); $581 for others (§ 12303.5.).[5]

Until 1981 recipients were entitled to *all* services authorized by section 12300. However, the 1981 amendments provided (for the first time) a funding cap on state appropriations furnished in order to obtain federal funding for the program.[6] (§ 12306, as amended, Stats. 1981, ch. 69, § 21.) The

---

[4]The Department had the "power and duties under this act as is necessary to implement federal administration of the State program . . . ." (Stats. 1973, ch. 1216, § 75, p. 2932.)

[5]By Statutes 1983, chapter 323, section 12303.5 was amended to increase the sum to $604 per month for nonseverely impaired persons and section 12304 was amended to increase the maximum grant to severely impaired persons to $872 per month.

[6]The Legislature originally passed the IHSS program to obtain 75 percent federal matching funds under title XX of the Social Security Act. (See *County of Sacramento v. State of California* (1982) 134 Cal.App.3d 428, 430-431 [184 Cal.Rptr. 648].) Title XX was amended by the Omnibus Budget Reconciliation Act of 1981, Public Law No. 97-35, § 2352, 95 Statutes 867. (§ 2003, 95 Stat. 868-869.)

amendment provided if state appropriations were insufficient to cover all authorized services, *specific types of services for particular groups of otherwise eligible persons should be cut before others.* (§ 12301, as amended, Stats. 1981, ch. 69, § 17.)

Recipients needing more than 20 hours per week of IHSS services have an absolute right to choose their providers. (§ 12304, subd. (b).) All other recipients are entitled to have their preferences followed by the county welfare department if possible. (§ 12304.1.)

"Protective supervision" services authorized by section 12300 are "for monitoring the behavior of nonself-directing, confused, mentally impaired, or mentally ill persons . . . ." (MPP § 30-457.71.) Such services consist "of observing recipient behavior in order to safeguard the recipient against injury, hazard, or accident." (MPP § 30-457.7.) To be eligible for such services, an individual must show "that twenty-four hour need exists . . . and that the recipient can live at home safely if protective supervision is provided." (MPP § 30-457.721.)

Some recipients are old, suffering degenerative diseases. Others are young but retarded, epileptic, blind, brain damaged or schizophrenic. The recipients cannot protect themselves from injury. Some are self-destructive. For example, one autistic, blind and brain-damaged child lapses "into seizures and temper tantrums . . . venting his frustrations by banging his head against a wall." Others cannot control normal but potentially hazardous activities such as cooking or smoking a cigarette. *Each person denied IHSS assistance solely under MPP sections 30.463.233c concededly needs the services by the terms of MPP sections 30-457.7 and 30.457.71.*

The "providers" (termed a "housemate" in the glossary of the regulations (MPP § 30-453)) who live with such a totally disabled person are usually relatives. None is legally responsible to support the recipient. These relatives often offer to provide care "not voluntarily" but because they cannot find anyone else who will do it as well.

The Department stopped payments to housemates for IHSS in April 1979[7] if the challenged MPP section 30-463.233c conditions and exceptions were not satisfied. Under the regulation an otherwise eligible recipient, who *in fact needs protective supervision, is deemed not legally in need* if he has a

---

[7]Before April 1979 the Department authorized payment for "protective supervision" to recipients whose housemates provided the services described in section 12300. Even before the inception of the IHSS program (1974), the Department paid housemates for attendant care services including protective supervision. (See *Vincent v. State of California* (1971) 22 Cal.App.3d 566 [99 Cal.Rptr. 410].)

housemate at home capable of providing supervision. The regulation exempts five groups of housemates: (1) another IHSS recipient unable to provide protective supervision; (2) a person physically or mentally unable to provide supervision; (3) a child under 14 (MPP § 30-463.235(b)); (4) a landlord or tenant of the recipient; or (5) a parent who left full-time employment, or cannot obtain it, to care for his minor child and cannot find anyone else to provide supervision. (MPP § 30-463.245.)

The state and county welfare departments have enforced MPP section 30-463.233c by terminating or denying IHSS assistance for protective supervision to thousands of totally disabled persons. Enforcement of the regulation has exacerbated the hardship of providing care at minimal pay. Some providers have given up jobs to provide care. This reduction in income—by denying payment for protective supervision—has placed even greater stress on the housemate's ability to care for the recipient.

The regulation poses Hobson's dilemma. Recipients needing 24-hour protective supervision—and other services—are more likely to receive better continuous care from relatives living with them whose care is more than contractual. This regulation forces housemate providers to render services for less compensation than other providers by denying them payment for protective supervision. These relatives, unless they have independent funds, must subsist on the reduced IHSS grant. If the housemate is required to work outside the home as a result of the reduced grant, the aged or disabled relative may have to be institutionalized.[8]

## II

### PLEADINGS AND PROCEEDINGS

Plaintiffs in both lawsuits charge the regulation conflicts with state statutory provisions governing the IHSS program, with section 504 of the Federal Rehabilitation Act (29 U.S.C.A. § 794) and with the equal protection guarantees of the state and federal Constitutions. Plaintiffs framed their complaint in four causes of action, seeking different remedies but all based upon the invalidity of the regulation. The first three causes of action sought relief for any person harmed by its enforcement. The first cause of action, by the organizations, was for a writ of mandate under Code of Civil Procedure section 1085. The second cause of action was a taxpayers' action for declaratory and injunctive relief under Code of Civil Procedure section 526, subdivision (a), based upon common law principles. The third cause of

---

[8]Statistics of the Department indicate a higher rate of institutionalization among IHSS recipients after the promulgation of MPP section 30-463.233c.

action, for declaratory and injunctive relief, was a class action by the organizations and an individual whose application for IHSS assistance had been denied pursuant to the regulation. The fourth cause of action, by individuals whose IHSS had been reduced under the regulation, was for a writ of mandate under Code of Civil Procedure section 1094.5 and Welfare and Institutions Code section 10962. Individual, not class, relief was sought in the last cause of action.

After discovery was completed plaintiffs filed motions for class certification and for summary judgment on all four causes of action. The Department opposed the summary judgment on the grounds the regulation was valid. The Department also opposed class certification contending the organizations were not adequate representatives. Finally, the Department sought the appointment of someone to represent persons whose grants might be reduced as a result of the lawsuit.

The trial court denied class certification stating three reasons: First, it was unnecessary to obtain relief for the class since an appeal in the individual case resulting in a published appellate court decision would provide relief to the class. Second, class certification would further delay consideration of the merits because prejudgment notice to prospective class members was required. Third, the only apparent purpose of the certification might be to obtain attorney fees.[9]

The trial court then denied the motion for summary judgment because it refused to decide the issue of the regulation's validity in any way other than by the individual's writ of mandate. The court suggested plaintiffs, as individuals, file motions for individual peremptory writs. The court reasoned

---

[9]This court in *Hogya* v. *Superior Court* (1977) 75 Cal.App.3d 122, 128, 132 [142 Cal.Rptr. 325], held an order denying class certification was reviewable by mandate and not as an appealable final judgment since the plaintiffs had a viable claim. (In accord *Rosack* v. *Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 747 [182 Cal.Rptr. 800].) Since *Hogya* the Supreme Court approved appeal of orders which deny relief to the entire class. (See *Green* v. *Obledo* (1981) 29 Cal.3d 126, 149, fn. 18 [172 Cal.Rptr. 206, 624 P.2d 256], where the Supreme Court said: "We have recognized an exception to the 'one final judgment rule' so as to allow a direct appeal from an order denying certification to an entire class on the theory that 'the order is tantamount to dismissal of the action as to all members of the class other than [the individual] plaintiff.' (*Daar* v. *Yellow Cab Co.* (1967) *supra,* 67 Cal.2d 695, 699.)" Whether the order is directly appealable or we treat this as a petition for writ of mandate, the issue of the class certification order is and should be before us. (*De-Grandchamp* v. *Texaco, Inc.* (1979) 100 Cal.App.3d 424, 437 [160 Cal.Rptr. 899]; *Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].)

The superior court order is also appealable as an order denying injunctive relief. (Code Civ. Proc., § 904.1, subd. (f).) Denial of class certification in the third cause of action for injunction effectively denied the individual plaintiffs' relief. (See *Payne* v. *Travenol Laboratories, Inc.* (5th Cir. 1982) 673 F.2d 798, 807.)

this procedure would insure a speedy binding ruling on the issue of the validity of the regulation since the loser could appeal and obtain an appellate decision. Plaintiffs appeal these adverse rulings.

The individual plaintiffs followed the court's advice and filed a writ virtually identical to the summary judgment motion. The Department's defenses were similar. The superior court ruled the challenged regulation was invalid under both state and federal law and granted the peremptory writ in each case but remanded the causes back to the Department to determine the plaintiff's entitlement to prospective and retroactive IHSS payments without regard to the regulation. The court awarded attorney fees. The Department appeals this award.

## III

### CLASS CERTIFICATION

■ The trial court's rule denying class certification rests upon a totally novel proposition: class action certification can be denied based upon the hope or expectation the Department will voluntarily grant class relief after an adverse appellate decision in an individual's case.[10] We cannot find any lawful authority to support this rationale. Class members are not parties to an individual decree. They cannot enforce such decision by contempt or supplemental decree.

■ While a trial court has broad discretion in determining class certification, its ruling will be reversed if it applies improper legal standards to deny the motion. (See *Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d 462, 470; *Gonzales* v. *Jones* (1981) 116 Cal.App.3d 978, 984 [171 Cal.Rptr. 567].) The trial court here did not dispute plaintiffs' contention they met both the ascertainability of class and the common question requirements for class certification nor did it adopt any of the Department's reasons for denying class certification. We conclude: None of the reasons proffered by the trial court are lawful grounds for denying class certification.

To determine the specifics of class certification standards, we look first to Code of Civil Procedure section 382: "[W]hen the question is one of a common or general interest, or many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." ■ Section 382 has been

---

[10]The trial court's assumption has proved unfounded. Upon oral argument the Department's counsel would not assure this court the Department would agree the entire class would benefit from this court's decision in the individual cases. Furthermore, statute of limitation problems face any individual not within the parameters of the class action.

construed to require an ascertainable class and well-defined community of interest in questions of law and fact. (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 706 [63 Cal.Rptr. 724, 433 P.2d 732].) Trial courts should "incorporate procedures from outside sources in determining whether to allow the maintenance of a particular class suit."[11] (*City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 453 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].)

■ The trial court must determine whether the class is ascertainable by examining (1) the class definition, (2) the size of the class and (3) the means of identifying class members. (*Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 821-822 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].) Plaintiffs' class was defined as "all applicants, recipients and providers of IHSS in California who have been or will be disqualified from receiving or providing protective supervision based solely on MPP § 30-463.233c." This class is precisely defined, numerous, statewide and easily identifiable.

■ A class action is proper when the parties are numerous and it·is impracticable to bring them all before the court. This requirement has been satisfied where the class numbers were as few as 200 (see *Vasquez* v. *Superior Court, supra,* at pp. 821-822; Fed. Rules of Civ. Proc., rule 23(a)(1)), or as many as several thousand (see *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695) if the members are scattered throughout the state. (See *Kennedy* v. *Harris,* order re class certification (1980) *approved,* 87 F.R.D. 372 (S.D.Cal. 1980).) *The Department's own data showed more than 5,000 disabled persons were either terminated from or denied protective supervision under the challenged regulation from its enactment in April 1971 until April 1980.* Providers' housemates were equal in number.

Members of each group, providers and disabled, are scattered throughout California. The location and identity of these class members could be readily obtained from the Department's records because each IHSS applicant or recipient fills out an application for benefits and identifies his or her provider. This identification procedure has been followed in other welfare class actions. (See *Hypolite* v. *Carleson* (1975) 52 Cal.App.3d 566, 578 [125 Cal.Rptr. 221]; *Lowry* v. *Obledo* (1980) 111 Cal.App.3d 14, 25 [169 Cal.Rptr. 732].)

■ The second statutory requirement, a "community of interest" turns on whether common questions of law and fact are sufficiently pervasive to

---

[11]Federal Rules of Civil Procedure 23 (28 U.S.C.A.) is cited as the source for more explicit rules for class actions in welfare cases. (*Green* v. *Obledo, supra,* 29 Cal.3d 126, 145.)

permit adjudication in a class action rather than in a multiplicity of suits. (*Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 801.) This requirement is satisfied if (1) there are predominate questions of law or fact common to the class, (2) the plaintiffs' claims are typical of those of the class, and (3) the plaintiff is an adequate representative. (See *Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d at p. 470; Fed. Rules of Civ. Proc., rule 23(a)(2), (3) and (4).)

The common question requirement is patently satisfied. The Department's action enforcing the challenged regulation similarly affects a large group of people. It is challenged on the identical legal grounds in each case. (See *Hypolite* v. *Carleson, supra,* 52 Cal.App.3d 566, pp. 579-581.) The legal claims arise out of a common set of factual circumstances. Since 1974 housemates were paid to provide IHSS protective supervision and the IHSS recipients in need of these services were eligible to receive them notwithstanding the fact they had a housemate provider. In April 1979 the defendants promulgated and enforced MPP section 30-463.233c to deny protective supervision to otherwise eligible IHSS recipients. As a result from April 1979 to date many individuals have been terminated from and denied protective supervision services. Thus the individual plaintiffs' claims are no different in specie from those of the class. ■ ■■■■ These individuals have either been personally injured or are organizations that represent those who have been personally injured by the enforcement of the challenged regulation.[12] The common goal of the entire class is to invalidate this regulation and to prevent its enforcement.

The persons constituting the "class" in this action are similar to welfare recipients whose cases have been certified as a class action in both state and federal courts. (See *Lowry* v. *Obledo, supra,* 111 Cal.App.3d 14, 20; *Hypolite* v. *Carleson, supra,* 52 Cal.App.3d 566, 581; *Green* v. *Obledo, supra,* 29 Cal.3d 126; and *Griffeth* v. *Detrich* (S.D.Cal. 1978) 448 F.Supp. 1137 (remanded (9th Cir. 1979) 603 F.2d 118.)

■ In order for the representative to adequately represent the class, the representative's attorney must be qualified, experienced and generally able to conduct the proposed litigation. (See *Richmond* v. *Dart Industries, supra,* 29 Cal.3d at p. 470.) Here plaintiffs' counsel have been recognized as experienced in class actions and government benefit litigation in many cases. (See, e.g., *Kennedy* v. *Harris, supra,* 87 F.R.D. 372; *Calloway* v. *Ma-*

---

[12]Although some of the plaintiffs are organizations, this is no basis for the denial of class certification. It is well settled law in California that such organizations have standing to file class actions to enforce rights of welfare claimants (see *Rogers* v. *Detrich* (1976) 58 Cal.App.3d 90, 102 [128 Cal.Rptr. 261]) and are class representatives who can adequately represent this class. (Civ. Code, § 1781, subds. (b)(2)-(4).)

*thews,* Unempl. Ins. Rptr. (CCH) ¶ 14,879, 2499-387, 2499-388 (S.D.Cal. 1976) (J.A. 72-74); *Griffeth* v. *Detrich, supra,* 448 F.Supp. 1137; *Torres* v. *Butz* (N.D.Ill. 1975) 397 F.Supp. 1015, 1017.) The class is, without question, represented by counsel, qualified and experienced in welfare class actions.

■ The trial court stated, as one of its reasons for denying certification, prejudgment notice was required. This is not a requirement in welfare class actions where declaratory or injunctive relief are the primary objective. (See *Lowry* v. *Obledo, supra,* 111 Cal.App.3d 14, 21, 23; *Gonzales* v. *Jones, supra,* 116 Cal.App.3d 978, 985-987; Fed. Rules Civ. Proc., rule 23(b)(2).) California decisions follow the analysis of the federal courts; prejudgment notice "serves no apparent purposes" in welfare class actions where there are no factual disputes and the class is adequately represented by counsel. (See *Elliott* v. *Weinberger* (9th Cir. 1977) 564 F.2d 1219, 1229; Fed. Rules Civ. Proc., rule 23(b)(2).) Plaintiffs seek declaratory and injunctive relief and incidental individual retroactive benefits, based solely on the invalidity of the Department's regulation. Notice to other class members is not necessary.

■ Finally, the trial court's observation the only purpose of certifying the class was to enable plaintiffs' counsel to recover attorney fees under Code of Civil Procedure section 1021.5 is not factually supported. Even if true, this would not defeat certification if otherwise warranted. Plaintiffs' counsel would be entitled to fees for each individual suit—as the superior court has here ruled. Recovery of statutory attorney fees is not relevant to the issue of the adequacy of class counsel or the issue of class certification. The very purpose of the statutory attorney fees provisions is to enable counsel to take cases on behalf of persons who might not otherwise have access to lawyers or the judicial system. Whether by class action or by individual suit, plaintiffs' counsel would be entitled to fees if the suit were successful. (§ 10962; *Burch* v. *Prod* (1979) 90 Cal.App.3d 987, 992 [153 Cal.Rptr. 751].)

IV

SUMMARY JUDGMENT

■ In denying plaintiffs' motion for summary judgment on the first three causes of action, the trial court refused to hear or to consider the challenge to MPP section 30-463.233c made by the organization plaintiffs. In consigning the first three causes of action to legal limbo, the trial court said the relief sought was unnecessary, given the presence of the individual writs of mandate under Code of Civil Procedure section 1094.5. As determined

above this is not a lawful basis for denying the summary judgment. California courts have uniformly recognized the rights of *organizations* to challenge the validity of state welfare Department regulations when inconsistent with state and federal law[13] and to seek declaratory/injunctive relief.[14]

The trial court's refusal to determine the issues tendered by the organizations was error. (*International Aerial Tramway Corp.* v. *Konrad Doppelmayr & Sohn* (1969) 70 Cal.2d 400, 404 [74 Cal.Rptr. 908, 450 P.2d 284]; *Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548].) There is no factual dispute and no triable issue of fact precluding summary judgment, therefore this court may determine that issue.

 MPP section 30-463.233c denies IHSS financial assistance for protective supervision services whenever *a nonexempt housemate* for the recipient provides those services. Such denial appears as a matter of law to be inconsistent with (a) statutory provisions governing the IHSS program, (b) specifically delineated relative responsibility laws, (c) recipient's right-to-choose-provider provisions, and (d) carefully defined statutory priorities for limiting services when there are insufficient funds.

 It is a fundamental rule of law and public policy that administrative regulations "must conform to the legislative will if we are to preserve an orderly system of government." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697].) The specific standards for testing the validity of an agency's regulation were succinctly summarized in *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]: "Where a statute empowers an administrative agency to adopt regulations, such regulations 'must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose.' [Citation.] The task of the reviewing court in such a case ' "is to decide whether the [agency] reasonably interpreted the legislative mandate." [Citation.]' . . . [*T*]*here is no agency discretion to promulgate a regulation which is inconsistent with the governing statute.*" (Italics added.) (See Gov. Code, § 11342.2.)

 In construing state statutes vis-à-vis administrative regulations, a court should look first to the language (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]), then to the legislative history (*Cooper* v. *Swoap* (1974) 11 Cal.3d

---

[13]See *California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237, 239 [113 Cal.Rptr. 154, 520 P.2d 970]; *Rogers* v. *Detrich, supra,* 58 Cal.App.3d 90, 102.

[14]See *Committee of the Rights of the Disabled* v. *Swoap* (1975) 48 Cal.App.3d 505, 508 [122 Cal.Rptr. 52]; *California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 448 [93 Cal.Rptr. 758, 482 P.2d 670].

856, 863-864 [115 Cal.Rptr. 1, 524 P.2d 97]) and finally to the general principles and policies underlying the statutory scheme. (*Id.,* pp. 866-867.) Within the ambit of these broad principles, courts have struck down welfare regulations inconsistent with the governing statutory scheme. (See *Green* v. *Obledo, supra,* 29 Cal.3d 126, at pp. 134-140; *Cooper* v. *Swoap, supra,* 11 Cal.3d 856, 863.)

The regulation here under scrutiny (MPP § 30-463.233c) imposes the responsibility on all nonexempt housemates to provide uncompensated protective supervision services for eligible recipients. This blanket prohibition of payment is totally inconsistent with the specific incremental changes made by the Legislature in modifying the statutory provisions concerning the responsibility of relatives for such services.

In 1975 the Legislature added section 12350 prohibiting any relative of a recipient from being "held legally liable to support or to contribute to the support of any applicant for or recipient of aid under this chapter." In 1979 the Legislature enacted the first of two modifications of the general no-relative-responsibility rule set out in section 12350. Section 12300 was amended to prohibit IHSS assistance to a parent of a minor child unless the parent has given up work or could not get full-time work because there was no other suitable provider. In 1981 the Legislature placed limited responsibility on one spouse to care for another by amending 12301 to read: "An able spouse who is available to assist the recipient shall be deemed willing to provide at no cost any services under this article except non-medical personal services and paramedical services."

These two amendments indicate a legislative intent to volunteer only the services of a *parent* of minor children or a *spouse*.[15] Both these classes of persons have a legal duty to support under Civil Code section 242 which had not been applied to the IHSS program under section 12350. Thus the legislative intent plainly limits the class of persons responsible for providing such services to these two specifically defined groups.

The Department without hint of legal authority has extended this legislatively limited class of volunteers. The regulation rests upon the unfounded presumption that any person residing with a recipient will provide aid. This may be a convenient method of cutting costs but where such methods are inconsistent with statutory provisions, they must be invalidated as beyond the agency's power to promulgate. (*Cooper* v. *Swoap, supra,* 11 Cal.3d 856, 868.) For example, in *Waits* v. *Swoap* (1974) 11 Cal.3d 887 [115

---

[15]By Statutes 1983, chapter 323, section 12301 was again amended to permit a spouse to be compensated for certain services including protective supervision in stated circumstances.

Cal.Rptr. 21, 524 P.2d 117], the California Supreme Court struck down welfare regulations reducing grants to children who shared housing with nonneedy relatives. The rationale is in point and most persuasive here. "The objective of the challenged regulation is apparently to reduce state expenditures for AFDC children at the expense of relatives who willingly take such children into their homes. In promulgating this unauthorized measure, the department is in reality gambling that close relatives acting as caretakers will feel a moral obligation to keep an AFDC child even though the child can no longer contribute the AFDC grant which the Legislature guaranteed. If the department 'wins' its gamble, the state will save money but only at the expense of depriving children of essential need items and subjecting their generous relatives to unwarranted hardships. If the department loses its gamble, as is all too possible, the children will lose the close family environment sought to be achieved by the act and the state will have to pay the higher cost of foster care." (*Waits* v. *Swoap, supra,* at pp. 895-896; fn. omitted.)

Although aimed at economy, the regulation undermines the recipient's right to choose his provider and may force recipients to accept a stranger or enter an institution. The enforcement of MPP section 30-463.233c threatens the basic policy of the IHSS program which seeks to prevent institutionalization by enabling recipients to remain at home, "to live . . . under an independent living arrangement." (§ 12300.) This Pyrrhic result is directly contrary to the express provision of section 12304, subdivision (b), which grants to individual recipients who need more than 20 hours per week of assistance the absolute right of "hiring and paying his own provider of in-home supportive services." Since 1979 section 12304.1 has required the county welfare department to give "preference" to any qualified individual provider who is chosen by the recipient. The legislative purpose is to insure the least intrusion upon the recipient's privacy because the services provided involve a most intimate and personal aspect of an individual's life.

The regulation also conflicts with specific statutes allocating services when state funds are insufficient to cover all the authorized services under the IHSS program. The Department justifies the regulation as necessary cost cutting.[16]

The argument fails. First, it is based on a misreading of the 1981 amendments which place a cap on state appropriations. Before 1981 the Legislature uniformly made an open-ended appropriation for the IHSS program.

---

[16]In 1981-1982 there was a 9.2 percent increase in the appropriation over the 1980-1981 appropriation. There was no evidence before the trial court to suggest there were insufficient funds to meet all of the authorized services.

(See § 12306.1.) In 1981 a funding cap was placed in section 12306 in these words: "The obligation of the state's General Fund under this article is limited to the amount appropriated in the annual Budget Act." To deal with the "possibility" the annual appropriation would not meet all the services authorized by the IHSS program the Legislature by the 1981 funding cap (§ 12301 as amended) provided *for a reduction in services* following these broad priorities:

"(a) Reduction in the frequency with which non-essential services are provided.

"(b) Elimination of non-essential service categories.

"(c) Termination or denial of eligibility to persons requiring only domestic services.

"(d) Termination or denial of eligibility to persons who, in the absence of services, would not require placement in a medical out-of-home care facility.

"(e) Per capita reduction in the cost of services authorized."

Exceptions to these broad categories must be made on a case-by-case basis for anyone who would require out-of-home medical care or lose his employment or who is placed in a "life-threatening" situation.

Furthermore, each county is required under section 12302 as amended to show how it would reduce services to eligible recipients in that county if expenses exceeded its budget. The Department is required to insure the county's plans "are in compliance with provisions of this article, including . . . Section 12301."

These provisions make it patently clear: *before any reductions are authorized for services to the totally disabled, the statutory procedures must be followed.* The statutory priorities for service reduction must precede funding cuts. The funding cut here occurs solely because the provider lives with the recipient. This is totally out of harmony with the statutory plan.

Nor can the regulation be justified by the Department's general assertion it is a means of preventing fraud. In the first place there are no statutory provisions denying protective supervision because there is a possibility of fraud in the home of the recipient. Secondly, there is no factual basis in this record for singling out housemates where the same regulation authorizes payment to live-in employees hired for the sole purpose of providing the

same services. Similar fraud arguments were rejected in *Lowry* v. *Obledo, supra,* 111 Cal.App.3d 14, when the Department sought to justify regulation denying child care deductions from a welfare recipient's income when the care was provided by the household. The Department's argument was: "[T]o strike the regulation at issue will leave the state defenseless against fraud and collusion between the applicant and members of the applicant's household. This argument is overstated. The record reflects that the county visits each child care provider to certify the services as adequate. Such procedures do not leave the state defenseless against fraud and collusion; to the contrary, they are some protection against this ever-present possibility." (*Id.,* at p. 21.)

The fraud argument should also be rejected here. Such generalized charge is no legal justification for a regulation contrary to the statutes.

## V

### FEDERAL LAW

■ Finally, if the foregoing composition of law and logic is insufficient to doom the regulation, then clearly under section 504 of the Federal Rehabilitation Act of 1973 (29 U.S.C.A. § 794) and its implementing regulations the regulation must be invalidated. It violates federal law because it denies benefits and services to a group of handicapped persons in a manner that defeats the purpose of the IHSS program. The act prohibits discrimination against qualified handicapped individuals in any program receiving federal financial assistance. Section 504 applies to the IHSS program. The program receives federal funding and all recipients needing protective supervision are "handicapped" under section 706(7).

Enforcement of the challenged regulation denies concededly handicapped individuals necessary assistance while granting it to others who do not have providers living with them. This violates 45 Code of Federal Regulations section 84.4(b)(1) (1982).[17] Further they are denied the right to choose a

---

[17] 45 Code of Federal Regulations section 84.4(b)(1) provides:

"(b) *Discriminatory actions prohibited.* (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap;

". . . . . . . . . . . . . . . . . . .

"(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

"(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

". . . . . . . . . . . . . . . . . . .

"(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service."

provider and may be subjected to a stranger-provider or institutionalization; either defeats the basic goals of the IHSS program and the federal regulations.

■ Finally the challenged regulation violates the equal protection clause of article I, section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution. In effect the regulation creates two classes of recipients and providers. It grants to one protective supervision and denies it to the other solely because an adult lives in the same house with the recipient. Both classes of recipients need the same assistance; both classes of providers give the same care. The basis for such discrimination, does not in right reason bear any substantial relationship to the purpose of the IHSS program. The Department has shown no correspondence between the classification made by this regulation and the goals of the IHSS program.

CONCLUSION

The matter is reversed with directions to certify the class action and to grant summary judgment as to counts one, two and three. The summary judgment granted as to the individual plaintiffs (count four) is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.