[No. D060381. Fourth Dist., Div. One. Apr. 3, 2013.]

MICHAEL BEDOE, Plaintiff and Respondent, v.
COUNTY OF SAN DIEGO, Defendant and Appellant.

COUNSEL

Thomas E. Montgomery, County Counsel, and Thomas D. Bunton, Deputy County Counsel, for Defendant and Appellant.

Barker Olmsted & Barnier, Christopher W. Olmsted and Jenna M. Crisci for Plaintiff and Respondent.

OPINION

**McINTYRE, J.**—The In-Home Supportive Services (IHSS) Program enables aged, blind or disabled poor to avoid institutionalization by remaining in their

homes with proper supportive services. (Welf. & Inst. Code, § 12300 et seq.; undesignated statutory references are to this code.) In this case, we examine whether an overpayment occurred where an individual provider admitted that he received payments for providing IHSS services, but that he did not personally provide any services. Instead, he informally subcontracted the provision of services to another family member.

As we shall discuss, the administrative hearing officer's decision finding that an overpayment occurred was supported by substantial evidence. Accordingly, we reverse the trial court's decision granting the individual provider's petition for a writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2007, the County of San Diego (the County) determined that Nancy Bedoe was eligible to receive IHSS. Nancy chose her son, Michael Bedoe, as her individual provider. (For clarity and ease of reference, we refer to these individuals and other witnesses sharing the same last name by their first names.) In 2010, the County sought return of $29,560 it had paid Michael between March 2007 and June 2009, on the ground he did not perform any services. Michael sought an administrative review of the County's overcharge determination. At an administrative hearing, a hearing officer heard testimony from Michael, Nancy and others.

Michael testified that he informed the County that he lived in Los Angeles County, but intended to move to San Diego. Michael, however, never moved to San Diego because he became disabled. Michael admitted that from about March 2007 to August 2009 he received payments for providing IHSS services, but that he did not provide these services. Instead, his sister Julie, who lived with Nancy, provided the services. Nancy or Julie mailed the monthly IHSS timesheets to Michael. Michael then filled out and signed the timesheets based on the IHSS services that Julie provided.

Michael obtained the IHSS checks and deposited most of the money into Nancy's bank account because Julie did not have a bank account. Michael kept about $100 or $200 from each check for "basic taxes and stuff." Michael claimed that Nancy and Julie worked out what to do with the money deposited into Nancy's account. Nancy testified that the payments deposited into her account were used by Julie to pay the monthly rent on Nancy's home. Michael admitted that the County explained his rights and responsibilities as a care provider and that he should have informed the County of this arrangement, but that he failed to do so.

Yoko Tanaka, a County representative, confirmed that Michael never informed her that he would not be providing Nancy's care. She testified that

IHSS rules and regulations did not allow subcontracting of IHSS services. Tanaka testified that Michael's actions constituted subcontracting because IHSS provider payments are intended to pay an individual provider to provide care for the recipient and are not intended to be used for the recipient's rent or other expenses. Finally, Avery Richey, a district attorney investigator, testified that Julie told him that she was never offered any money for taking care of Nancy, that she never received any money, and that she received a place to live in exchange for taking care of Nancy. (Although Michael objects to Richey's testimony as inadmissible hearsay, this objection was forfeited as it was not made below. In any event, at the administrative hearing, hearsay is admissible to supplement or explain other evidence. However, hearsay, if objected to, is not sufficient to support a finding, unless it would be admissible in a civil action—in other words, unless it is within an exception to the hearsay rule. (Gov. Code, § 11513, subds. (c), (d).))

The hearing officer subsequently issued a decision upholding the overcharge determination, finding that an overpayment occurs where an individual provider "submits timesheets and collects payment for more hours than actually worked." The hearing officer found it was undisputed that Michael submitted claims and received provider payments from IHSS from March 2007 to August 2009, but that he did not provide any services to the IHSS recipient.

Michael filed a petition for writ of mandate in the San Diego County Superior Court. The trial court granted the petition, finding that the hearing officer's decision was not supported by substantial evidence. The trial court acknowledged that, "[i]n her administrative decision . . . the hearing officer interpreted the IHSS statutory and regulatory scheme to not allow a provider to be paid for services performed for the recipient by another person." It found, however, that "[e]ven assuming, arguendo, that the hearing officer's interpretation is implied by the IHSS statutory and regulatory scheme, a lay person such as [Michael] could not have been expected to know that he was prohibited from arranging for another person to perform the services for the recipient." The County timely appealed.

## DISCUSSION

### I. *Standard of Review*

In reviewing the decision of an administrative agency not involving a fundamental right the trial court reviews the whole record to determine whether the decision is supported by substantial evidence and whether the agency committed any errors of law. (*Donley v. Davi* (2009) 180 Cal.App.4th 447, 455–456 [103 Cal.Rptr.3d 1].) On appeal, we stand in the shoes of the

trial court and apply the same standard of review. (*Ibid.*) We presume the agency's findings are supported by the administrative record; it is the appellant's burden to show that they are not. (*Id.* at p. 456.) We do not reweigh the evidence but indulge in all presumptions and resolve all conflicts in favor of the agency's decision. (*Ibid.*) "We may reverse an agency's decision only if, based on the evidence before it, a reasonable person could not have reached such decision. [Citations.]" (*Ibid.*) We exercise independent judgment on pure questions of law. (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921–922 [87 Cal.Rptr.3d 365].)

## II. *Applicable Law*

■ Sections 12300 et seq. govern the IHSS program. Under the statutory scheme, the County is authorized to recover overpayments from providers. (§ 12305.83.) An overpayment is defined as "the amount paid by the department or the State Department of Health Services to a provider . . . which is in excess of the amount for services . . . furnished pursuant to this article." (§ 12305.8, subd. (b).) The State Department of Social Services (DSS) promulgates regulations to implement the statutes. (*Miller v. Woods* (1983) 148 Cal.App.3d 862, 868 [196 Cal.Rptr. 69].) The State Department of Social Services Manual of Policies and Procedures (DSS Manual), section 30-769.911 defines "[e]xcess compensation to an individual provider" as including situations where "[t]he provider was paid for more hours than authorized or more hours than worked."

■ Additionally, the County of San Diego In-Home Supportive Services Program Guide (Program Guide) states that "[i]ndividual providers (IPs) provide in-home services to IHSS recipients. They are required by the State of California to submit timesheets for time worked. Recipients are required to sign the timesheets verifying that the provider(s) performed all of the hours that are approved on the timesheet. [¶] . . . [¶] It is considered an overpayment when an IP submits timesheets and collects payment for . . . [m]ore hours than actually worked." (Program Guide, at p. 5-D-1.) The Program Guide provides examples of overpayment situations that could be referred for prosecution as including instances where (1) a provider submitted claims and received payment, but did not provide the services to the recipient, and (2) a person other than the authorized provider supplied services for less than minimum wage and the recipient and/or authorized provider signed the timesheets, cashed the paychecks, and pocketed the difference. (Program Guide, at p. 6-C-4.)

## III. *Analysis*

■ As we shall explain, substantial evidence supported the hearing officer's decision that an overpayment occurred as this term is defined in the

governing statute, the DSS Manual and the Program Guide. (§ 12305.8, subd. (b); DSS Manual, § 30-769.911; Program Guide, at p. 5-D-1.) Here, Michael admitted that from about March 2007 to August 2009 he received payments for providing IHSS services, but that he did not provide these services. Instead, his sister Julie provided the services. Julie, however, did not receive any payment for her services. Rather, she received a place to live in exchange for taking care of Nancy. Michael deposited the IHSS payments into Nancy's bank account to pay Nancy's rent. Michael, however, kept about $100 or $200 from each check for "basic taxes and stuff." This evidence clearly established that an overpayment occurred because Michael received payment for services "in excess of the amount for services . . . furnished" (§ 12305.8, subd. (b)) because he submitted timesheets and was paid for more hours than he actually worked. (DSS Manual, § 30-769.911; Program Guide, at p. 5-D-1.)

To avoid this result, Michael claims he subcontracted the provision of services to Julie. He asserts that it is irrelevant who provided the services and that as long as someone provided services to the IHSS recipient there was no overpayment. Specifically, in arguing that subcontracting is allowed, he points to a provision in the Program Guide titled "Individual Provider Subcontracting," which states: "A person other than the authorized provider is providing services for less than minimum wage and the recipient and/or authorized provider is signing the timesheets, cashing the paychecks, and pocketing the difference." (Program Guide, at p. 6-C-4.) We reject this assertion.

This provision appears in a section of the Program Guide entitled "Referrals for Prosecution" which then provided the provision as an "*example[] of [a] possible situation[]* that would require a fraud referral for possible prosecution." (Program Guide, at p. 6-C-4.) Thus, rather than endorsing subcontracting, the Program Guide clearly provided subcontracting as an example of a situation that *required* a referral for possible prosecution.

Notably, the facts here fit precisely into the example of fraud provided in the Program Guide. Namely, Julie, a person other than the authorized provider, provided services for less than minimum wage as the evidence shows that Julie received a place to live, but no wages for the services she provided. Michael, Michael's daughter and Nancy all testified that the money deposited into Nancy's bank account was used to pay Nancy's rent. Finally, Michael testified that he signed the timesheets, cashed the paychecks, and kept some of the money.

We reject Michael's argument that subcontracting should be allowed. Subcontracting thwarts the intent behind the statutory and regulatory scheme

pertaining to IHSS. IHSS recipients are allowed to choose their own providers to deliver the services. (§ 12302.25, subd. (a); Program Guide, at p. 5-A-1.) Nonetheless, registered providers are treated as County employees (§ 12302.25; DSS Manual, § 30-701(e)(1)) that are paid hourly for covered services performed (DSS Manual, § 30-765.21) through a combination of federal, state and county funds. (§ 12306.21.) The DSS is responsible to provide worker's compensation coverage, pay taxes for unemployment insurance, disability insurance and Social Security, and deduct the taxes for social security and state disability insurance from a provider's paycheck. (§ 12302.2; DSS Manual, § 30-769.81 to 30-769.83.)

■ Additionally, IHSS recipients are prohibited from employing providers who have been convicted of certain crimes. (§§ 12301.6, subd. (e)(5)(B)(ii), 12305.81.) Providers that wish to be registered as IHSS providers must pass a criminal background check (Program Guide, at p. 5-F-1) and IHSS recipients may elect to pay for a criminal background check for any current or potential IHSS provider. (Program Guide, at p. 5-A-3.)

■ Finally, individuals who provide IHSS services must also be properly trained. (§ 12301.24.) Effective November 1, 2009, prospective individual providers must complete a provider orientation, which includes: the requirements to be an eligible IHSS provider; a description of the IHSS program; the rules, regulations, and provider-related processes and procedures, including timesheets; the consequences of committing fraud in the IHSS program; and the Medi-Cal toll-free telephone fraud hotline and Internet Web site for reporting suspected fraud or abuse in the provision or receipt of supportive services. (§ 12301.24, subd. (a).) While Michael became a provider before the effective date for the orientation requirement, subdivision (c) of section 12301.24 requires that "all current providers . . . receive the information described in this section. Following receipt of this information, a provider shall submit a signed agreement, consistent with the requirements of this section, to the appropriate county office." Taken together, the statutory and regulatory scheme suggests that subcontracting is not allowed.

Lastly, although Michael asserts he lacked actual notice that he had to personally perform the IHSS services and could not subcontract the provision of services, he provided no authority that such knowledge is required before a provider can be ordered to repay an overpayment. Even assuming such knowledge is required, Michael was required to sign and submit standardized provider timesheets that verified the truth of the information and informed the provider that he or she might be subject to civil penalties if the information is found not to be true and correct. (§ 12301.25, subd. (a).) Michael admitted that he filled out, signed and submitted the required timesheets. The standardized provider timesheets required that the "[p]rovider" sign and instructed

that "THE TIMESHEET MUST BE COMPLETED WITH THE HOURS YOU WORKED." (Program Guide, *supra*, at p. 5-F-19.) Additionally, Tanaka testified that providers were required to sign IHSS "Client/Employer and Provider Responsibilities" form number 12-58A wherein the provider acknowledged that he or she was responsible for "[p]roviding all services for which I was hired and accurately reporting hours worked on my timesheets." (Program Guide, *supra*, at p. 5-F-5.) Tanaka further testified that the form was processed every year and that a copy of the form was available to the hearing officer in the case file. Michael's argument is further undercut by his own testimony that the County explained his rights and responsibilities as a care provider, that he failed to inform the County that he was not providing Nancy's care, and that he should have informed the County of his arrangement to have Julie provide Nancy's care, but that he failed to do so.

For these reasons, we reverse the trial court's decision granting the petition for a writ of mandate.

## DISPOSITION

The judgment is reversed. Appellant is entitled to its costs on appeal.

McConnell, P. J., and Benke, J., concurred.