[No. D015543. Fourth Dist., Div. One. Oct. 22, 1993.]

COUNTY OF SAN DIEGO et al., Plaintiffs and Appellants, v.
KATHLEEN BROWN, as State Treasurer, etc., et al., Defendants and
Appellants;
COUNTY OF FRESNO et al., Interveners and Appellants;
COUNTY OF SAN MATEO et al., Interveners and Appellants.

COUNTY OF FRESNO et al., Plaintiffs and Appellants, v.
STEPHEN W. MAYBERG, as Director, etc., et al., Defendants and
Appellants.

[No. D018698. Fourth Dist., Div. One. Oct. 22, 1993.]

STEPHEN W. MAYBERG, as Director, etc., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
COUNTY OF FRESNO et al., Real Parties in Interest.

## Counsel

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, Michael B. Poynor, Bruce D. MacLeish and Ian Fan, Deputy County Counsel, for Plaintiffs and Appellants County of San Diego et al.

Daniel E. Lungren, Attorney General, and Charlton G. Holland III, Assistant Attorney General, for Defendants and Appellants and for Petitioner.

Phillip S. Cronin, County Counsel and Howard K. Watkins, Deputy County Counsel, for Interveners and Appellants, Plaintiffs and Appellants and Real Parties in Interest County of Fresno et al.

Thomas F. Casey III, County Counsel, and Brenda B. Carlson, Deputy County Counsel, for Interveners and Appellants County of San Mateo et al.

No appearance for Respondent.

## OPINION

**KREMER, P. J.**—Plaintiffs County of San Diego et al. (San Diego plaintiffs) and plaintiff interveners appeal the portion of a judgment after court trial finding no constitutional violation in the allocation among counties of mental health funds under the Short-Doyle Act (Welf. & Inst. Code,[1] former § 5600 et seq.) by the state's Department of Mental Health (Department). We affirm the portion of the judgment determining the funding allocations were constitutional.

Defendants Kathleen Brown et al. (the state defendants) and defendant interveners appeal the portions of the judgment declaring unconstitutional the Department's allocation of state hospital beds among counties, ordering the Department to reallocate beds, granting injunctive relief against defendants and awarding plaintiff counties damages as compensation for charges for past bed overuse. The state defendants also challenge the court's findings they violated former section 5600 and the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.). We reverse the portions of the judgment declaring the bed allocations unconstitutional, ordering bed reallocation, enjoining defendants and awarding damages. We reverse the portions of the judgment involving claims of violations of former section 5600 and the APA with directions to the superior court to dismiss those claims as moot.

Plaintiffs County of Fresno et al. (Fresno plaintiffs) appeal the portion of the judgment denying their claim against the Department under the federal Rehabilitation Act of 1973 (FRA) (29 U.S.C. § 794) for reimbursement of funds expended by Fresno in treating its Lanterman-Petris-Short Act (LPS) conservatee Robert S. We affirm that portion of the judgment.

The Department's Director Stephen W. Mayberg (Director) petitions for extraordinary relief directing the superior court to stay an order of contempt and to take no action to enforce those portions of the judgment requiring the Department to provide state hospital beds to counties without reimbursement. We grant the petition and direct the superior court to dismiss the contempt proceedings as moot.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

I

ALLOCATION OF MENTAL HEALTH FUNDING AND STATE HOSPITAL BEDS

A

INTRODUCTION

This litigation primarily involves a constitutional challenge by various plaintiffs including several counties to the Department's allocation of mental health resources within California.[2] Plaintiffs claimed the inequitable distribution of such resources, specifically allocations to the counties of funds and state hospital beds, was without rational basis and thus unconstitutional under the due process and equal protection clauses of the federal and state Constitutions. Plaintiffs also claimed the state defendants violated former section 5600, the APA and the FRA.

After trial the superior court concluded the state defendants violated former section 5600 and the APA. The court also concluded the Department's state hospital bed allocations and charges to the counties for bed overuse violated federal and state due process and equal protection guarantees. The court awarded plaintiff counties damages for the bed overuse charges. The court concluded there was currently no constitutional violation in the Department's allocation of Short-Doyle Act funds to the counties.

B

FACTUAL BACKGROUND

1

*Funding*

In 1957 the Legislature enacted the Short-Doyle Act (Stats. 1957, ch. 1989, p. 3535) to provide counties with state funds for local mental health programs. The purpose of the Short-Doyle Act was to encourage community and state participation in mental health care by providing a means to share funding of community programs. Funding under the Short-Doyle Act was originally set by the level a county chose to fund its mental health program.

---

[2]These consolidated cases included intervener counties on both sides. The counties of Fresno, Imperial, Riverside, San Bernardino, Stanislaus and Tulare intervened as plaintiffs. The counties of Alameda, Contra Costa, Los Angeles, Marin, Mendocino, Napa, San Francisco, San Mateo and Solano intervened as defendants. We may generally refer to the parties and their related interveners as simply plaintiffs or defendants.

Counties funding their programs at higher levels received more state funds, resulting in some counties developing larger programs, providing more services and receiving additional state funding.

From 1957 until 1969 county participation in the Short-Doyle program was voluntary. In 1969 participation became mandatory for counties with populations over 100,000. In 1973 the program became mandatory for all counties.

Since the beginning of the Short-Doyle program San Mateo has participated. In fiscal year 1958-1959 San Francisco, Contra Costa and Alameda began participating. During the next three years Los Angeles, Solano and Mendocino entered the program. Entering the program in fiscal year 1962-1963 was San Diego, the first plaintiff county to use Short-Doyle funds. Over the next 11 years the other plaintiff counties joined the program. In each year until fiscal year 1973-1974 plaintiff counties' average aid per capita was lower than defendant counties' average aid per capita. Thus, plaintiff counties generally entered the Short-Doyle program later and did not participate to the same extent as defendant counties.

Originally Short-Doyle was a dollar-for-dollar state-to-local matching fund program. In 1962 the funding ratio changed, with the state providing 75 percent of the funds and the counties 25 percent. In 1969 the matching fund ratio changed to 90 percent state and 10 percent county.

In the 1960's there was enough state money to go around to the counties. Defendant counties as a group took greater advantage of available state funds by posting greater local matching funds.[3] In fiscal year 1962-1963 San Diego's level of local payment was $136,848 and San Francisco's $784,816. In fiscal year 1964-1965 San Diego's level of local payment was $678,680 and San Francisco's $1,707,921.[4]

During the 1960's federal funding was also available as construction and staffing grants. San Francisco and Los Angeles took advantage of the federal

[3] In its statement of decision the superior court noted: "State funding was likened to a money tree and San Diego regularly did not pick the tree because of its unwillingness to spend its revenues on the 25% match requirement."

[4] The superior court found: "The current unequal distribution of state funds stems from these historical participation decisions."

grants to build mental health programs. San Diego, Fresno and other "under-equity" counties often did not apply for federal funds.[5] When federal funding ceased, the state sometimes replaced the lost federal funds. Those state funds became part of a participating county's larger base allocation.

Short-Doyle funds were allocated based on the "county plan" each participating county was required to submit each year. The county plan specified how the county would spend its money and indicated community need. Through the mid-1970's a county through its plan could submit requests for new and expanded programs based on community needs. Base funding was carried forward each year. As permitted, many counties asked the state for additional money to expand their programs. That new money became part of the base allocations to be carried forward.

After voters passed Proposition 13 in 1978, state funds for mental health began to shrink, base allocations essentially remained static, and funding equity among counties became an issue.

In 1981 the Equity Funding Task Force issued a report to the California Conference of Local Mental Health Directors. Acknowledging the existence of funding inequities created by historical Short-Doyle funding, the report recommended distributing funds according to relative need based on a poverty-population formula. The report characterized the poverty-population method as an interim measure for use to move toward equity while studies sought an appropriate affirmative approach. In about 1982, after study, the Department began using a poverty-population model.

The 1983 Budget Act required the Department to submit to the Legislature "an equitable needs formula proposal for the allocation of mental health funds." In April 1984 in response the Department issued a summary of the Equitable Mental Health Allocation Project. The summary recommended using a poverty-population model. The summary also recommended the state

---

[5] "Under-equity" and "over-equity" refer to whether a county was allocated more or less than its "poverty-population" share of mental health resources. Plaintiff counties were under-equity counties. Defendant counties were over-equity counties.

"Equity" existed where a county's relative share of allocated mental health resources was equal to its relative share of the need for such resources as determined by its share of the state's poverty and population under the Department's poverty-population formula. The poverty-population formula assigned a value to a county's poverty population as a percentage of statewide poverty population and compared that value to the percentage of state resources for mental health care the county received from the Department. "Relative need" was the percentage of total state population and total state poverty-population residing in a county. "Relative resource" was the percentage of total state mental health funding currently allocated to a county. "Current base" was the platform from which progress toward equity was measured.

use new money exceeding the base to achieve funding equity but not reallocate each county's historical resource base. The report noted further study was needed and indicated the poverty-population method was an interim measure for use until "better service delivery data" became available.

After introduction and withdrawal of legislation to allocate mental health resources on a per capita basis, the Legislature in 1985 passed Senate Bill No. 786 (the Seymour amendment). Senate Bill No. 786 amended former section 5600 to require new funds above the current base be allocated among counties based on the poverty-population formula. The legislation also prohibited reduction of the counties' base allocations to achieve equity.[6]

From 1981 to 1991 the counties' respective equity positions remained essentially constant. The relatively small amounts of new money allocated to under-equity counties did not have lasting effect on equity due in part to those counties' faster rates of population growth. Under-equity counties remained under-equity. Over-equity counties retained their over-equity positions.[7]

2

*State Hospital Beds*

Until 1972 the Department did not charge counties for their patients' use of state mental hospital beds. In fiscal year 1972-1973 the Department began charging counties a 15 percent match for using the previously free state

---

[6]Former section 5600 as amended in relevant part provided: "Available funding for local programs, beyond the current base plus any cost-of-living adjustment granted by the Legislature, shall be allocated to counties based upon relative need, defined and appropriately revised by the department on an annual basis as the percentage of total state population and total state poverty population residing in that county. By January 1, 1987, the department shall submit to the Legislature data on the actual numbers of persons served and applicants awaiting service in each county to be considered as part of the formula in the future. However, until equity of funding between counties is achieved, the allocation of funds shall also take into account the difference between relative needs, as defined above, and current relative resources, defined as the percentage of total state mental health funding currently allocated thereto, in such a manner that progress toward equity is reasonably assured provided, however, that no county allocation may be decreased for this purpose. [¶] If state financing problems require a decrease in the department's total allocation and the amount available for local programs, the director shall distribute funds to each county based upon a method which takes into primary account the issue of equity of funding among the counties."

[7]For example, in fiscal year 1984-1985 San Diego received 69 percent of the mental health money it would have received if all state funds were allocated based only on the poverty-population index while San Francisco received 208 percent. In fiscal year 1989-1990 San Diego received 68 percent and San Francisco 222 percent.

hospital beds. A county could buy state hospital services with funds allocated for local programs. (Former §§ 5708, 5714.)[8] Thus, a link was established between local funding and state hospital beds, with local dollars becoming convertible into beds.

The state began shifting its resources into community funding and gradually reduced the number of state hospital beds. Additional funding for state hospital beds generally went to improving the standard of care for patients at the facilities instead of increasing the number of beds.

Until fiscal year 1980-1981 state hospital beds were allocated based upon each county's actual usage, that is, supply matched demand with demand being constrained, as in the case of Short-Doyle funds, by the requirement of a local match.

For fiscal year 1980-1981 the Legislature in the Supplemental Budget Act set state hospital bed allocations to the counties based upon historical usage.[9] Except for minor modifications and changes required by injunctions in this case, state hospital bed allocations remained constant after the 1981 freeze. Through the 1980 Supplemental Budget Act the Legislature established a buy-out and bed reduction program which increased funding for local community programs in return for counties reducing their use of state hospital beds. (Stats. 1980, ch. 510, item 302(f), p. 1166.) Under that program San Diego received increased funding for local mental health programs in exchange for giving up about half its historical allocation of state hospital beds.[10] Thus, another link was established between local funding and state hospital beds, with beds becoming convertible into local dollars.

Concluding the Legislature had established a bed allocation to counties that was not to be changed except for the buy-out provision, the Department in 1981 froze state hospital bed allocations based upon historical usage. The Department also interpreted the Seymour amendment's language prohibiting decreasing a county's allocation for equity purposes as a legislative directive the Department could not lower a county's bed allocation. When a county overused its allocation of state hospital beds, corresponding portions of the funds appropriated annually for local assistance were transferred to the appropriation for support of state hospitals. Between 1986 and 1988 about

---

[8]Former section 5714 provided in relevant part: "So much of each county allocation as is required to care for patients in state hospitals shall be retained by the state and used to support such hospitals."

[9]The superior court noted San Francisco was allocated 89,869 bed days per year, San Diego 21,539, Napa 8,540 and Imperial 1,427.

[10]In fiscal year 1982-1983 San Diego sold back 9,679 bed days to obtain more funding and afterwards its allocation remained at 11,860.

$2 million for bed overuse was withheld from San Diego's funding allocations. The Department denied San Diego's requests for relief from the assertedly inequitable allocation of mental health resources.

From 1981 to 1991 state hospital bed allocations remained basically constant. The number of state hospital beds available to counties essentially froze at 1981 levels.

### 3

### *"Realignment" Legislation*

After trial and before entry of judgment the Legislature enacted the Bronzan-McCorquodale Act, revising the method of funding for county mental health services and discontinuing Department allocation of community mental health funds and state hospital beds. (§§ 4330 et seq., 17600 et seq.; Stats. 1991, chs. 89 & 611.) Under such "realignment legislation" counties received funds from the state and could decide to use that money to fund local programs or to pay the Department for state hospital beds. Under realignment counties could purchase at full price as many state hospital beds as they deemed necessary and were willing to buy. No fixed number of beds was allocated to any county. Realignment also allocated portions of expected tax revenue growth for equity purposes. San Diego, Orange and Santa Clara received additional adjustments.

Later, in July 1993, the Governor signed into law as an emergency statute Senate Bill No. 463 amending various aspects of realignment including base funding, transfers among accounts and distribution of growth accounts. (Stats. 1993, ch. 100.)

### C

### SUPERIOR COURT PROCEEDINGS

### 1

### *Procedural Background*

In July 1986 San Diego plaintiffs—including the County of San Diego, four members of its board of supervisors, and its public conservator for three conservatees—filed a class action complaint in San Diego County Superior

Court case No. 568230 for declaratory and injunctive relief against the State of California and various state officials, including the Director.[11] Asserting denial of federal and state constitutional guarantees of equal protection and due process, San Diego plaintiffs alleged the state defendants distributed funds and allocated state hospital beds in a manner depriving San Diego of its fair share. Plaintiffs characterized the allocations as based not on need but instead on perpetuating past years' allocations. Plaintiffs also asserted the state defendants did not distribute the funds as required by former section 5600 and the FRA.

In March 1988 the court granted San Diego plaintiffs' request for a preliminary injunction against the state defendants.[12]

In June 1989 the court consolidated for all purposes case No. 568230 with other pending lawsuits.[13] The court also permitted various counties to intervene as plaintiffs or defendants.

In October 1989 another preliminary injunction was granted.[14]

---

[11] In addition to the state and the Director, the state defendants included former State Treasurer Unruh, the State Controller, the Director of the Department of Finance and the Secretary of the Health and Welfare Agency.

[12] The court preliminarily enjoined the state defendants from "[a] Taking any action to reduce the utilization of LPS State hospital beds by plaintiff County of San Diego below the number of beds the County is now utilizing; [b] Denying admission of LPS patients from the County of San Diego to the State hospitals based on utilization or allocation of such beds, until the utilization of such beds by plaintiff County of San Diego reaches its fiscal year 1986-87 level of utilization; [c] Reducing the subventions to, payments to, or funds of the plaintiff County of San Diego's local mental health programs or in any way charging the County for past or current utilization of state hospital beds in excess of the County's allocated beds, unless such utilization exceeds that allowed by the order of this Court."

[13] The lawsuits consolidated with case No. 568230 were San Diego County Superior Court case No. 596055 where the County of San Diego sought injunctive, declaratory and extraordinary writ relief in a challenge to the allocation of state hospital beds among counties based on the same grounds alleged in case No. 568230 and as violating the APA; and San Diego County Superior Court case No. 612752 where the County of Fresno, its Director of Health and its Director of Mental Health sought injunctive and declaratory relief involving the allocation of state hospital beds. Another consolidated case has been dismissed. (San Diego Super. Ct., case No. 612496.)

[14] The court issued an injunction:

"(a) prohibiting the State Defendants from reducing the number of state hospital bed days each county may use below the greater of (i) that county's 1987-88 allocations, or (ii) the number of bed days used by that county during fiscal year 1988-89;

"(b) prohibiting the State Defendants from returning or otherwise transferring county patients presently in state mental hospitals to the counties from which the patients came as a result of orders of this court;

In December 1989 the court modified its October 1989 preliminary injunction.[15] The court ordered the injunction to have statewide effect. The court also reaffirmed its March 1988 preliminary injunction.

In July 1990 the court determined all plaintiffs had standing and permitted plaintiff interveners to join as parties individual members of their Boards of Supervisors as county officials and as taxpayers.

2

*Trial*

Coming for trial were plaintiffs' claims the Department's allocations of mental health funding and state hospital beds violated equal protection and due process as arbitrary, capricious and lacking in standards; and the state defendants violated former section 5600, the APA and the FRA.

The court held separate phases of trial on various issues.

(a)

*Phase One*

From September 18, 1990, through November 1, 1990, the court tried issues involving various alleged statutory violations by state defendants. After the first phase of trial, the court issued a decision and order on statutory violations dated January 10, 1991.

The court concluded the Department did not comply with two reporting requirements of former section 5600 and ordered the Department to comply with those statutory requirements. The court also concluded the Department violated former section 5600 by not properly allocating new moneys to

---

"(c) prohibiting the State Defendants from reducing any county's allocation of state mental hospital beds below the allocation for the 1987-88 fiscal year or Short-Doyle funding below the level for the 1988-89 fiscal year; and

"(d) prohibiting any modification in the system of allocating state hospital beds to the counties unless 60 days notice of such change has been given to this court and to all parties to these consolidated actions."

[15]The October 1989 injunction was modified by the addition of language providing: "Counties utilizing state hospital beds above their allocation shall not be charged or assessed an amount greater than that provided by Welfare and Institutions Code Section 5714.2, as amended, and the Department of Mental Health Letter Number 86-33, to the extent the Letter is consistent with Section 5714.2."

under-equity counties.[16] The court ordered the Department to adopt an allocation scheme consistent with its opinion and also ordered all future allocations of available funds beyond the current base be done in a manner ensuring reasonable progress toward equity.[17]

The court concluded the Department violated the APA by not promulgating regulations about funding, allocation of state hospital beds and collection of assessments for bed overuse. The court ordered the Department to adopt the requisite regulations.[18]

(b)

*Phase Two*

From January 28, 1991 through February 21, 1991, the court tried constitutional issues. Plaintiffs asserted the disparities among counties in the Department's allocations of mental health funding and state hospital beds were unconstitutional under equal protection and due process theories as lacking any rational basis. Defendants denied any constitutional violation, asserting the disparities were not great and any such disparities were rationally related to the legitimate governmental interest of ensuring the continuity and stability of local programs. The parties stipulated the court could apply the rational basis test to plaintiffs' claims.[19]

After trial the court found no current constitutional violation in "maintaining the discrimination in mental health funding allocations." With respect to plaintiffs' equal protection claim, the court concluded preserving the stability of treatment of existing patients and avoiding harm to the infrastructure

---

[16]The court found the failure to reallocate state hospital beds on the basis of need did not constitute a violation of former section 5600.

[17]Noting realignment did not reenact the two assertedly violated reporting requirements of former section 5600, plaintiffs have abandoned those claims. Plaintiffs also concede the July 1993 enactment of Senate Bill No. 463 has rendered moot their claim the Department's allocation of new moneys violated former section 5600. Thus, we reverse the portions of the judgment involving violations of former section 5600 with directions to the superior court to dismiss such statutory claims as moot.

[18]As discussed below, the court also found the Department violated the FRA with respect to Fresno LPS conservatee Robert S.

[19]"In ordinary equal protection cases not involving suspect classifications or the alleged infringement of a fundamental interest, the classification is upheld if it bears a rational relationship to a legitimate state purpose. [Citations.]" (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 958-959 [109 Cal.Rptr. 553, 513 P.2d 601].) A similar rational basis standard applied to plaintiffs' due process claims. (*McCourtney* v. *Cory* (1981) 123 Cal.App.3d 431, 439 [176 Cal.Rptr. 639].)

of over-equity counties' programs were legitimate governmental concerns that were "rationally related to the legislative goal of maintaining a base funding level while attempting to cure the discrimination with new funds over time." The court also concluded the mental health funding allocations did not violate federal or state constitutional guarantees of procedural or substantive due process.

The court found the Department's allocation of state hospital beds among counties violated federal and state constitutional guarantees of equal protection. The court concluded the "gross inequities" in state hospital bed allocations were "not explained by any legislative purpose."[20] The court also found state hospital bed allocations violated federal and state substantive due process guarantees. The court stated "the present system of bed allocation is not rationally related to a legitimate goal of government."[21] To achieve an equitable distribution correcting the constitutional violations found by the court, the Department was ordered to "reallocate bed days among the counties according to each county's poverty-population index within three years unless the state devises a constitutional alternative and presents it to the court for approval by June of 1992." The court also determined plaintiff counties were entitled to money damages as compensation for past bed overuse charges.

The court made permanent the existing injunctions in the case. The court also ordered: "No county shall be charged or assessed for over-utilizing its allocation of state hospital beds so long as the county does not utilize more beds than the county would have been allocated had its bed allocation been based on its poverty population percentage for the year."

The court found no violation of the FRA in the allocation of Short-Doyle funding or state hospital beds.[22]

---

[20]In its statement of decision the court noted: "In fact, the bed allocations are exactly the reverse of the legislature's intent. State hospital beds are intended to supplement those counties with low Short-Doyle allocations. [Citation.] In reality the greater state hospital bed allocations go to those counties with greater Short-Doyle funding allocations." The court also noted: "Short-Doyle moneys were allocated in part to reduce local dependence on state hospital beds yet those counties with higher Short-Doyle fund allocations generally have the higher state hospital bed allocations as well."

[21]The court found no procedural due process violation with respect to state hospital bed allocations.

[22]Plaintiffs do not challenge that finding.

On August 8, 1991, the court entered judgment.[23] All parties have appealed.

## D

### DISCUSSION

#### 1

#### *Plaintiffs' Appeal*

Seeking reversal of the court's conclusion the funding component of the state's mental health resources allocation system was constitutional, plaintiffs ask us to declare the entire Short-Doyle resource allocation system unconstitutional as violating the equal protection and due process rights of plaintiff counties and their residents. However, we conclude the superior court properly determined the funding allocations were rationally based and did not violate any constitutional standard.

#### (a)

#### *Standing*

Preliminary, we note defendants challenge plaintiffs' standing to raise this constitutional attack on the mental health resources allocation system. Defendants contend the court erred in permitting plaintiff counties and members of their boards of supervisors to bring these lawsuits on their own behalf or as representatives of their residents. However, we do not decide the issue of standing. Even if we concluded plaintiffs had standing, we would affirm the portions of the judgment based on the court's finding the funding allocations were constitutional. We would also reverse those portions of the judgment based on the court's finding the state hospital bed allocations were unconstitutional. .

---

[23]The judgment provided:

"Plaintiffs have and recover from the state defendants the amount equal to the bed overuse charges imposed by the State less that amount which would have been charged had the bed-day allocations been based upon the poverty-population formula.

"The Department of Mental Health is ordered to comply with Welfare and Institutions Code Section 5600. The Department of Mental Health is further ordered to adopt regulations pursuant to the Administrative Procedures Act. The Department of Mental Health is further ordered to, within three years, re-allocate state hospital bed-days among the counties based on their poverty population percentages or present an alternative plan to the court for approval.

"The injunctions in this case are continued pending a final remedy of the statutory and constitutional violations found in this action. The court reserves jurisdiction to oversee the remedial aspect of this action."

### (b)

### *Introduction*

This litigation does not involve an abstract problem of bookkeeping. Instead, the Legislature faced an historically developed concrete situation involving ill human beings which was not amenable to a perfect solution. As a result of historical choices by various county governments when funds were plentiful, an infrastructure was created of local community health programs providing ongoing care relied upon by many people. When funds dried up, the Legislature was confronted with the problems of providing care for all needy ill people and equalizing funding to counties. However, full attainment of both those goals could not be achieved simultaneously because of the inadequacy of available funds. The Legislature thus confronted the stark choice of continuing ongoing care for real people or distributing the shortfall among all counties. It was not irrational for the Legislature to decline to equalize allocations immediately in an abstract manner which could damage many programs and hurt many ill people. Instead, the Legislature acted rationally in moving toward equity over time by allocating new moneys when available while preserving existing programs.

### (c)

### *Funding Allocations Were Constitutional*

In concluding disparities in funding allocations were not unconstitutional, the superior court found maintaining a base funding level while attempting to cure the discrimination with new funds was rationally related to the legitimate governmental concerns of maintaining the stability of treatment of existing patients and avoiding harm to the infrastructure of over-equity counties' programs.[24] ■ Plaintiffs contend the court erred in not declaring the discriminatory funding allocations unconstitutional as based on prior years' allocations and not rationally related to counties' differing needs or any other legitimate state purpose. Plaintiffs contend the stated governmental purposes here—stabilizing existing patient care and preserving county program infrastructures—failed to pass scrutiny as "realistic." (*Brown* v. *Merlo* (1973) 8 Cal.3d 855, 865, fn. 7 [106 Cal.Rptr. 388, 506 P.2d 212, 66

---

[24]Noting the Seymour amendment had been effective for only five years and thus insufficient time had elapsed to conclude the funding scheme violated the constitution, the court also stated the discriminatory allocations could not be indefinitely justified and should be eliminated within a reasonable time.

A.L.R.3d 505].)[25] Instead, according to plaintiffs, that stated rationale was simply an excuse to maintain a discriminatory system favoring politically powerful counties. Characterizing stabilization of over-equity counties' programs as creating "an irrational and permanent advantage" at the expense of under-equity counties' residents including the mentally ill, plaintiffs contend the evidence of "enormous" monetary discrimination against under-equity counties demonstrated the "totally arbitrary nature of the mental health resource allocation system, and its discriminatory impacts on both plaintiff counties and their residents." Asserting equal protection requires elimination of irrational discrimination within a reasonable time (*Allegheny Pittsburgh Coal* v. *Webster County* (1989) 488 U.S. 336, 343-344 [102 L.Ed. 688, 696-698, 109 S.Ct. 633]), plaintiffs contend the evidence demonstrated despite years of inequity the state defendants did not develop any plan likely to achieve equitable distribution within a reasonable time without judicial intervention. Plaintiffs also assert legislative changes since the early 1970's have perpetuated instead of cured the discriminatory funding allocations.[26] Thus, plaintiffs claim they proved without refutation by defendants that the discriminatory funding allocations were irrational, arbitrary, and not rationally related to any legitimate state concern. However, the superior court properly determined community mental health funding allocations were rationally based and not unconstitutional.

The test in adjudicating plaintiffs' equal protection claims is whether the distinctions drawn by state defendants ". . . 'bear some rational relationship to a conceivable legitimate state purpose.' [Citation.]" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16 [112 Cal.Rptr. 786, 520 P.2d 10]; also *Weber* v. *City Council*, *supra*, 9 Cal.3d at pp. 958-959.) This record amply supported the superior court's finding the "discrimination" resulting from maintaining counties' base funding levels while attempting to cure the disparities with new funds over time was rationally related to the legitimate governmental concerns of preserving the stability of treatment of existing patients and not harming the infrastructure of county mental health programs. Plaintiffs have not demonstrated palpable irrationality in protecting existing programs and allocating new funds to move toward equity. (Cf.

---

[25]In *Brown* v. *Merlo*, *supra*, 8 Cal.3d 855, the Supreme Court stated: "Although by straining our imagination we could possibly derive a theoretically 'conceivable,' but totally unrealistic, state purpose that might support this classification scheme, we do not believe our constitutional adjudicatory function should be governed by such a highly fictional approach to statutory purpose." (*Id.* at p. 865, fn. 7.)

[26]According to plaintiffs, the Seymour amendment simply clarified the state's earlier approach to resolving the equity issue by allocating portions of new moneys to under-equity counties and requiring consideration of the equity issue if funding cuts were necessary. Plaintiffs also characterize as "totally unreasonable" the state's goal of achieving equity by apportioning only new moneys.

*Nordlinger* v. *Hahn* (1992) __ U.S. __ [120 L.Ed.2d 1, 16-18, 112 S.Ct. 2326, 2335-2336]; *County of L.A.* v. *Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 392 [196 P.2d 773]; *Mitchell* v. *Swoap* (1973) 35 Cal.App.3d 879, 888 [113 Cal.Rptr. 75].)[27]

The superior court effectively concluded the state defendants properly balanced the goals of maintaining existing local mental health programs and attempting to achieve equity in funding among counties. When funds were plentiful, some counties took advantage of the opportunity to develop local mental health systems. The court properly found the state had a legitimate "stability" interest in avoiding destruction of that local community health base already built. When funding declined, the Legislature acknowledged the equity problem and sought solutions including the Seymour amendment which required allocations among counties based on the poverty-population formula of new funds above the current base.

The evidence demonstrated a rational basis for protecting base allocations to counties. As the court properly found, stability of programs was necessary to provide patients with a continuum of care.[28] A stable continuum of care was crucial to mentally ill patients and their families. Reduction in base funding would adversely impact the continuum of care. Loss of an outpatient clinic resource could result in placing a patient in a hospital. Further, reallocating base funding would cause lost economic efficiency and value. In 1984 the Equitable Mental Health Allocation Project specifically recommended maintaining base allocations because not doing so would be "inefficient and impractical." In sum, maintaining base allocations was essential

---

[27]In the rational basis context a governmental policy is not unconstitutional unless it is "palpably arbitrary." (*Nordlinger* v. *Hahn, supra,* __ U.S. at p. __ [120 L.Ed.2d at pp. 16-18, 112 S.Ct. at pp. 2335-2336].)

"The rule that all presumptions are in favor of the validity of statutes and that a classification made by the Legislature will not be overthrown by the courts unless it is palpably unreasonable has added force when, as here, the statute has been accepted as valid for many years, and vast sums have been invested in reliance upon the rights granted." (*County of L.A.* v. *Southern Cal. Tel. Co., supra,* 32 Cal.2d at p. 392.)

" 'In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." [Citation.] "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." [Citation.] "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [Citation.]' [Citation.]" (*Mitchell* v. *Swoap, supra,* 35 Cal.App.3d at p. 888.)

[28]"Continuum of care" encompassed all services offered by a county from acute inpatient programs to less restrictive outpatient programs.

for administering mental health programs and ensuring the necessary continuum of care for patients.[29]

The allocation of funding was not irrational simply because absolute equity had not been attained by the time of trial. The state defendants made reasonable adjustments to the mental health funding scheme over time to begin to eliminate unreasonable disparities. Various studies recommended changes the Department adopted and implemented. The state instituted an allocation policy to change the system so that relative resource allocations would approach relative needs without dismantling existing programs. The Legislature codified such approach in the Seymour amendment.[30] According to plaintiffs' expert, use of the poverty-population formula over the past six years furthered the goal of equity in allocating state mental health funds. Other evidence indicated applying the poverty-population formula in fiscal year 1990-1991 reasonably assured progress toward equity.

Further, the unequal funding allocations were rationally related to the legitimate governmental concerns of stability of patient care and preservation of existing local program infrastructure. As the superior court properly found, the unequal distribution of state funding resulted from the counties' historical choices about participating in the Short-Doyle incentive matching grant program. Participation in the program was voluntary until 1973. In the 1960's money was available to all counties but San Diego declined because it did not want to spend its revenue on the 25 percent matching requirement. Plaintiff counties entered the program later and did not participate to the same extent as defendant intervener counties. Unlike plaintiff counties,

---

[29]The court found: "The testimony by medical professionals established the harmful effect of disrupting treatment of patients already on a treatment plan. Dr. Richard Elpers testified the families of mental health patients typically go to great lengths to get the patients into programs. Once in the program, continuum of care is critical and, if absent, patients frequently give up and leave the program. Dr. John Kimball Deitrich, Beverly Abbott, and Roberto Quiroz also testified supporting the necessity of maintaining the level of care for individual patients. It is rational for the state to strive not to leave vulnerable citizens in a worse condition than they would be in had they not been involved with state programs."

The court also noted: "Dr. John Kimball Deitrich testified it was important for the state to maintain base allocations in order for the county programs to have financial stability. Past cuts to existing programs have caused staff turnover and made recruitment difficult for a significant period after the cuts. Cuts in funding cause a lack of confidence in the programs' financial stability on the part of suppliers who will be less interested in entering into contracts with the county programs. Long term obligations for physical plant resources are more difficult to obtain. Contracts necessary for the operation of the program become more expensive due to the increased risk to the supplier. The court concludes it is rational for the state to seek stability of the counties' mental health infrastructure."

[30]The court found the Legislature adopted the poverty-population need index as the "needs" portion of the formula calling for distributing increases in mental health resources to counties on a relative needs/relative resources basis.

defendant intervener counties consistently overmatched funds. Defendant intervener counties also took greater advantage of available federal funds. During the 1970's many counties asked for and received from the state more money to expand their programs and such new money became part of the base allocations to be carried forward. Indeed, plaintiffs acknowledge the disparate funding allocations favored "counties which entered the Short-Doyle system earlier and to a greater extent than other counties in the 1950's and 1960's."

In sum, the disparities in funding allocations resulted from various counties historically making consistent commitments to developing local mental health programs when ample funding was available and other counties declining to do so. Plaintiffs effectively seek to deprive defendant interveners of the results of their choices made long ago. By the late 1980's all counties experienced inadequate funding and had unmet needs. The trial court's determination allowed for maintenance of investments counties had chosen to make over several decades.

Accordingly, we conclude the superior court properly found the stability of patient care and program infrastructure was a legitimate governmental concern and the method used to allocate funding including maintaining base allocations was rationally related to providing such stability. Based upon those findings, the court correctly determined the unequal funding allocations did not violate equal protection guarantees. (Cf. *Nordlinger* v. *Hahn*, *supra*, __ U.S. at p. __ [120 L.Ed.2d at pp. 13-14, 112 S.Ct. at p. 2333]; *City of Rancho Cucamonga* v. *Mackzum* (1991) 228 Cal.App.3d 929 [279 Cal.Rptr. 220].)[31]

■ Similarly, the court correctly concluded the funding allocations did not violate due process. Noting plaintiffs admitted their citizens did not have property rights to mental health treatment and plaintiffs did not introduce any evidence otherwise indicating they had the requisite property interest to invoke procedural due process guarantees, the court found no procedural due process violation. The court also properly found no substantive due process violation. "Substantive due process essentially requires protection from arbitrary legislative action. Under this principle, a deprivation of property is

---

[31]In *Nordlinger* v. *Hahn, supra*, __ U.S. __ [120 L.Ed.2d 1, 112 S.Ct. 2326], the Supreme Court noted: " 'The protection of reasonable reliance interests is not only a legitimate governmental objective: it provides an exceedingly persuasive justification. . . .' (internal quotations omitted)." (*Id.* at p. __ [120 L.Ed.2d at p. 14, 112 S.Ct. at p. 2333].)

In *City of Rancho Cucamonga* v. *Mackzum, supra*, 228 Cal.App.3d 929, in rejecting an equal protection claim the appellate court noted "the challenged legislation is supported by the sound and rational policies of channelling [*sic*] scarce local property tax revenues to those agencies which had relied on such revenues most before Proposition 13." (*Id.* at p. 947.)

justified 'only if the conduct from which the deprivation flows is prescribed by reasonable legislation reasonably applied, i.e., the law must not be unreasonable, arbitrary or capricious but must have a real and substantial relation to the object sought to be obtained.' [Citation.]" (*Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 617, fn. 14 [194 Cal.Rptr. 294].) Even assuming deprivation of property occurred here, the classification bore a rational relation to a constitutionally permissible objective. (*McCourtney* v. *Cory*, *supra*, 123 Cal.App.3d at p. 439.)

At most plaintiffs simply showed the existence of unequal funding among counties on a per capita basis. Plaintiffs did not demonstrate such inequality violated constitutional guarantees of equal protection or due process. Accordingly, we affirm the superior court's finding the allocation of mental health funding under former section 5600 was constitutional.

2

*Defendants' Appeal*

(a)

*State Hospital Beds and Overuse Charges*

(i)

*Superior Court Findings*

The superior court found the allocation of state hospital beds violated constitutional guarantees of equal protection and substantive due process. The court issued injunctive relief including ordering reallocation of state hospital beds among counties according to each county's poverty-population index within three years unless the state defendants presented an alternative plan to the court for approval. The court also found plaintiff counties were entitled to damages from the state defendants for bed overuse charges.

In declaring the bed allocations unconstitutional, the court found the "gross inequities" were "not explained by any legislative purpose." The court stated "freezing state hospital bed allocations over a ten year period is not rationally related to protecting patients from harm." The court also found "beds are not so integrated in the counties' mental health system that they cannot be separated from funding. Defendants have shown nothing more than a theoretical connection between the bed allocations and their Short-Doyle funds." The court interpreted former section 5600's language "no

county allocation may be decreased" as not prohibiting reallocation of beds. The court concluded a "reasonable distribution of beds" could be achieved within three years "through attrition and reassignment."

## (ii)

### *Defendants' Contentions*

Defendants contend the court made an initial misstep in misinterpreting former section 5600 as excluding beds from a county's base allocation. Defendants then contend the court erred in declaring the bed allocations unconstitutional and ordering reallocation. Defendants also contend the court erred in awarding plaintiff counties damages for bed overuse charges. Additionally, defendants contend we should reverse the superior court's findings involving plaintiffs' constitutional claims and direct the court to dismiss those claims as moot.

## (iii)

### *Analysis*

### (A)

### *Beds Were Part of Base Allocations Under Former Section 5600*

The superior court essentially concluded former section 5600 did not either require or prohibit reallocation of hospital beds among counties.[32] Instead, the court interpreted the statute as not including beds as part of a county's mental health resource base allocation. Thus, the court rejected plaintiffs' assertion the equity and relative-need language in former section 5600 required reallocation of state hospital beds among counties. Accordingly, the court found the failure to reallocate beds on the basis of need did not violate the statute. The court also rejected defendants' assertion the statutory language "no county allocation may be decreased" for equity purposes prevented any reallocation of beds. Thus, the court concluded the

---

[32]As noted, former section 5600 provided in relevant part: "Available funding for local programs, beyond the current base plus any cost-of-living adjustment granted by the Legislature, shall be allocated to counties based upon relative need, defined and appropriately revised by the department on an annual basis as the percentage of total state population and total state poverty population residing in that county. . . . However, until equity of funding between counties is achieved, the allocation of funds shall also take into account the difference between relative needs, as defined above, and current relative resources, defined as the percentage of total state mental health funding currently allocated thereto, in such a manner that progress toward equity is reasonably assured provided, however, that no county allocation may be decreased for this purpose."

Department was free to reallocate beds without violating former section 5600. Such conclusion permitted the court to characterize its reallocation order as not inconsistent with the statute.

█ Defendants contend the court erroneously interpreted former section 5600 as excluding state hospital beds from the counties' base allocations of mental health resources and thus did not realize its reallocation order was inconsistent with the statute. According to defendants, counties' bed allocations were protected by former section 5600's language prohibiting decreasing any county's base allocation to achieve equity. We agree with defendants. The court erred in concluding the statutory prohibition against decreasing a county's allocation applied only to funds and not to beds. Under former section 5600, state hospital beds also constituted an allocation not subject to decrease for equity purposes. We base our conclusion on (1) the Department's consistent administrative interpretation known to the Legislature that the statute precluded decreasing a county's bed allocation for equity purposes; (2) the Legislature's independent recognition in budgetary legislation that bed allocations were to remain static—indicating it would be inconsistent for the Department to act otherwise; and (3) the historical linkage between allocations of state hospital beds and funding for local mental health programs.

The record contained ample evidence the Department considered state hospital bed allocations to be included under former section 5600's prohibition against decreasing any county's "allocation" for purposes of achieving equity. Evidence also indicated such statutory provision was designed to prevent dismantling of programs and reallocation of base resources to achieve equity. The Department adopted the recommendation of the Equitable Mental Health Allocation Project report in 1984 that state hospital bed allocations should be included in a county's mental health resource base. Beginning in 1984 the Department included the value of beds in the resource base, thus impacting allocations of local assistance augmentations. The Department also interpreted the Seymour amendment's language prohibiting decreasing a county's allocation for equity purposes as a legislative directive the Department could not lower a county's bed allocation.

In sum, after the Seymour amendment the consistent administrative interpretation of former section 5600 was not to decrease a county's state hospital bed allocation for purposes of equity. Although presumed to be aware of such administrative interpretation, the Legislature did not amend former section 5600 to permit decreasing bed allocations for equity purposes. Courts generally defer to administrative interpretation of statutes, particularly where, as here, the Legislature has acquiesced in such interpretation.

(*Thornton* v. *Carlson* (1992) 4 Cal.App.4th 1249, 1256-1257 [6 Cal.Rptr.2d 375].)[33] Thus, the superior court should have interpreted former section 5600 as preventing decreasing counties' bed allocations for equity purposes.

Further, the superior court's interpreting former section 5600 as excluding state hospital beds from counties' base allocations was inconsistent with the Short-Doyle program's historical fiscal fungibility between funds and beds. In fiscal year 1972-1973 the Department began charging counties a 15 percent match for using previously free state hospital beds. A county could buy state hospital services with funds allocated for local programs. (Former §§ 5708, 5714.) Thus, when the state first began requiring the counties to make co-payments for beds a link was established between local funding and beds, with local program funds becoming convertible into beds. As resources became increasingly scarce, the state chose to allocate both beds and local program dollars with continued fungibility. In the 1980 Supplemental Budget Act the Legislature set state hospital bed allocations to the counties based upon historical usage and established a buy-out and bed reduction program which increased funding for local community programs in return for counties reducing their use of state hospital beds. (Stats. 1980, ch. 510, item 302(f), p. 1166.)[34] Another link was thus established between local funding and state hospital beds, with beds becoming convertible into local dollars. Manifestly, the superior court's interpretation of former section 5600 as excluding beds from counties' base allocations was unreasonable in light of the historical linkage between local program funds and state hospital beds.

As noted, the trial court found legitimate governmental purposes—stability of patient care and preservation of county program infrastructure—were rationally related to former section 5600's protection of counties' base allocations with respect to funding for local programs. A proper interpretation of former section 5600 as including beds within counties' base allocations would have facilitated the court's concluding the bed allocation system

---

[33]In *Thornton* v. *Carlson*, *supra*, 4 Cal.App.4th 1249, the appellate court stated: " ' "Consistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight . . . ." ' [Citations.] This is particularly true where the Legislature and other interested parties have long acquiesced in the interpretation. [Citations.] 'Under these circumstances, the administrative practice will be upheld " 'unless it is *clearly* erroneous or unauthorized.' " ' [Citations.]" (*Id.* at pp. 1256-1257, italics in original.) The court also stated: " 'The Legislature is presumed to be aware of a long-standing administrative practice . . . . If the Legislature, as here, makes no substantial modifications to the act, there is a strong indication that the administrative practice [is] consistent with the legislative intent.' [Citations.]" (*Id.* at p. 1257.)

[34]As noted, under that buy-out and bed reduction program San Diego received increased funding for local mental health programs in exchange for giving up about half its historical allocation of state hospital beds.

was also rationally related to those same legitimate governmental purposes. Indeed, plaintiffs acknowledge "in considering the unconstitutionality of the system, there was no legal or factual basis for the trial court to carve out a distinction between beds and program funds."[35]

(B)

*State Hospital Bed Allocations Were Constitutional*

(4)  Seeking reversal of the portions of the judgment declaring state hospital bed allocations unconstitutional and mandating reallocation of beds, defendants contend maintaining counties' bed allocations while moving toward equity with available new moneys did not violate any equal protection or substantive due process right of the counties. Instead, according to defendants, the bed allocations satisfied the rational basis test under both equal protection and due process principles. (*Nordlinger* v. *Hahn, supra,* __ U.S. at p. __ [120 L.Ed.2d at pp. 17-18, 112 S.Ct. at p. 2336]; *Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 [278 Cal.Rptr. 346, 805 P.2d 300]; *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 163-164 [211 Cal.Rptr. 368, 695 P.2d 665]; *Cooper* v. *Bray* (1978) 21 Cal.3d 841, 847-848 [148 Cal.Rptr. 148, 582 P.2d 604].)[36] We agree.

---

[35]Plaintiffs also acknowledge the "State itself measures equity in terms of each county's share of the entire combined resource base—beds plus program funds—without distinction between the two components."

[36]". . . '[E]ven improvident decisions will eventually be rectified by the democratic process and . . . judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted' . . . . [Citation.]" (*Nordlinger* v. *Hahn, supra,* __ U.S. at p. __ [120 L.Ed.2d at p. 12, 112 S.Ct. at p. 2336].)

In *Coleman* v. *Department of Personnel Administration, supra,* 52 Cal.3d 1102, the Supreme Court stated: "Generally, the constitutional guaranty of substantive due process protects against arbitrary legislative action; it requires legislation not to be 'unreasonable, arbitrary or capricious' but to have 'a real and substantial relation to the object sought to be attained.' [Citation.] Thus, legislation does not violate substantive due process so long as it reasonably relates 'to a proper legislative goal.' [Citations.]" (*Id.* at p. 1125.)

"[U]nder the traditional, rational relationship equal protection standard, what is required is that the court ' "conduct 'a serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals.' " ' [Citations.]" (*Fein* v. *Permanente Medical Group, supra,* 38 Cal.3d at p. 163, italics in original.) The Supreme Court also noted California case law had "never been interpreted to mean that we may properly strike down a statute simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem. [Citation.]" (*Ibid.*)

In *Cooper* v. *Bray, supra,* 21 Cal.3d 841, the Supreme Court noted under the traditional equal protection standard of review the "judiciary affords challenged legislation a presumption of constitutionality." (*Id.* at p. 847.) The court also noted: " 'Some decisions require that the classification " 'bear some rational relationship to a conceivable legitimate state purpose' " [citation]; others, that the classification must rest upon "some ground of difference

"When social or economic regulations are involved, the rational-basis test applies. In such cases, ' "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." ' [Citations.]" (*Hansen* v. *City of San Buenaventura* (1986) 42 Cal.3d 1172, 1190 [233 Cal.Rptr. 22, 729 P.2d 186].) " ' "The Fourteenth Amendment does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state." [Citation.] Rather, the Equal Protection Clause is offended only if the statute's classification "rests on grounds wholly irrelevant to the achievement of the State's objective." [Citations.]' [Citation.]" (*Kadrmas* v. *Dickinson Public Schools* (1988) 487 U.S. 450, 462 [101 L.Ed.2d 399, 412, 108 S.Ct. 2481].) Under the rational basis test, plaintiffs had the " 'heavy burden' " to demonstrate the state's protection of counties' historical bed allocations was without reasonable basis. (*Id.* at p. 463 [101 L.Ed.2d at p. 413].) Plaintiffs did not meet that burden. The record compelled a conclusion legitimate governmental interests justified preserving counties' bed allocations.

As discussed above, the superior court properly concluded the legislative goal of maintaining a base funding level preserving existing services while attempting to achieve equity with new moneys over time was constitutional as rationally related to the legitimate governmental interests of maintaining the stability of existing patient care and the infrastructure of local programs. Defendants accurately assert the court should have found the same governmental interests also justified maintaining historical bed allocations. When confronted with the choice of continuing ongoing care for real people or distributing the shortfall among all counties, it was not irrational for the Legislature to decline to equalize bed allocations immediately in an abstract mathematical manner which could damage local program infrastructure and hurt many ill people. Instead, the Legislature acted rationally in moving toward equity over time by allocating new moneys when available while preserving historical bed allocations.

The superior court's erroneous conclusion the bed allocations were unconstitutional stemmed primarily from two mistaken findings. First, failing to acknowledge the import of the historical reciprocal fiscal relationship between beds and local funding, the court found bed allocations could be analyzed separately from funding allocations.[37] Second, based on a tenuous factual finding most state hospital patients were transient, the court also

---

having a fair and substantial relation to the object of the legislation" [citations].' [Citation.]" (*Id.* at pp. 847-848.)

[37]As noted, the superior court found "beds are not so integrated in the counties' mental health system that they cannot be separated from funding. Defendants have shown nothing more than a theoretical connection between the bed allocations and their Short-Doyle funds."

The court also found: "In virtually every legislative pronouncement on the subject it is clear the intent of the legislature was to reduce county dependence on state hospital beds. This has

understated the effect of bed reallocation on the treatment of existing patients.[38]

## (1)

### *Bed Allocations Were an Integral Part of County Mental Health Systems*

The superior court erred in finding state hospital beds were not so integrated in counties' mental health systems that they could not be separated from funding. The record compelled a conclusion bed allocations have historically been an integral part of local mental health systems. Further, maintaining such historical bed allocations was rationally related to the legitimate governmental interests of preserving the stability of existing patient care and local program infrastructure.

As discussed at length, the Department properly allocated hospital beds in accord with former section 5600's requirement a county's base allocation including beds could not be decreased for equity purposes. Further, former section 5600 reflected the Short-Doyle program's historical fiscal fungibility between funds and beds. When the state first began requiring the counties to make copayments for beds a link was established between local funding and beds, with local program funds becoming convertible into beds. (Former §§ 5708, 5714.) As resources diminished, the state chose to allocate both beds and local program dollars with continued fungibility. Beds became convertible into local dollars when the 1980 budget legislation set state hospital bed allocations to the counties based on historical usage and established a buy-out and bed reduction program which increased funding for

---

not occurred. Short-Doyle moneys were allocated in part to reduce local dependence on state hospital beds yet those counties with higher Short-Doyle fund allocations generally have the higher state hospital bed allocations as well."

The court further stated: "Inequities in bed allocations have existed for at least twenty-four years. In 1981, DMH froze bed day allocations and since then they have remained constant except for minor changes and changes wrought by the injunctions in this case. The gross inequities are not explained by any legislative purpose. In fact, the bed allocations are exactly the reverse of the legislature's intent. State hospital beds are intended to supplement those counties with low Short-Doyle allocations. [Citation.] In reality the greater state hospital bed allocations go to those counties with greater Short-Doyle funding allocations."

[38]The court found "patients will suffer from reductions in bed allocations if those reductions necessitate the eviction of existing patients needing care. Protecting patients from harm is a legitimate governmental purpose. Nevertheless, freezing state hospital bed allocations over a ten year period is not rationally related to protecting patients from harm. [¶] The evidence shows the average state hospital stay is slightly over ninety days. Therefore, while it is undisputed some patients have been in the hospital for years, it is clear most of the population is transient. A total freeze of beds is so far removed from what is necessary to accomplish the goal of not harming patients by eviction as to be totally irrational."

local community programs in return for counties reducing their use of state hospital beds. (Stats. 1980, ch. 510, item 302(f).) In enacting the Seymour amendment, the Legislature directed the counties' base allocations including beds not be reduced. Although the superior court might not unreasonably discern a legislative intent ultimately to reduce local dependence on state hospital beds, for purposes of constitutional analysis the legislatively established historical reciprocal relationship between local funding and beds in practice inextricably linked those two components of the mental health resources allocation system.

Ample evidence indicated state hospital beds were an integral part of counties' programs and decreasing those bed allocations were "just as damaging as a decrease in the community budget, because each county builds its program around the resources it has."[39] Community programs were built around the concept of having access to a certain level of state hospital beds.[40] Local programs were based on the number of patients who could be treated in the community and those who required treatment in a state hospital. Counties geographically closer to state hospitals also tended to use those hospitals as more integral parts of their local programs for acute patients, in part because patients discharged from hospitals tended to remain in nearby communities. Some counties farther from state hospitals built acute mental health facilities to complement local care.[41] In sum, historical state hospital bed usage differed among counties according to how those beds fit into the structure of each county's overall local mental health program.

Further, in light of the fungibility of state hospital beds and funding, differing historical bed allocation levels arose also from various counties choosing to invest more local matching funds in mental health services than did other counties. Counties' bed allocations developed based on their actual usage. Beginning in 1981 counties could choose to have their bed allocations adjusted. San Diego opted to reduce its bed allocation by one-half in exchange for enhanced local program funding it continues to receive.

Finally, the evidence demonstrated a rational basis for protecting bed allocations to counties. Maintaining those bed allocations was rationally related to the legitimate governmental concern of avoiding harm to the

---

[39]Indeed, in its statement of decision the superior court acknowledged evidence "counties' programs have developed in relationship to the allocation of bed days and on the beds being an integral part of a [county's] patient continuum of care."

[40]For example, Los Angeles relied on the number of beds allocated as an integral part of its mental health system.

[41]In 1960 San Diego built its own psychiatric hospital. San Diego treated its mentally ill patients locally to "keep them in touch with friends, relatives and the community."

infrastructure of county programs. Reallocating beds, including reducing some counties' bed allocations, would adversely affect community programs. A county receiving a decreased bed allocation would need to use funds otherwise spent on community programs to help those who would have been in state hospitals. As noted, the superior court found cuts to programs would cause staff turnovers, recruitment difficulties, and interference with counties' ability to contract with suppliers. Thus, the court should have concluded the protection of counties' bed allocations furthered the goal of protecting existing programs.

(2)

*Bed Reallocation's Harmful Effect on Patient Care*

Finding the protection of patients from harm was a legitimate governmental purpose, the superior court noted patients would suffer from reductions in state hospital bed allocations if the reductions necessitated evicting existing patients needing care. However, based on its finding most of the state hospital population was transient with an average hospital stay of about 90 days, the court concluded the 10-year freeze on bed allocations was not rationally related to the goal of not harming patients. The court stated: "A total freeze of beds is so far removed from what is necessary to accomplish the goal of not harming patients by eviction as to be totally irrational."

The record casts doubt on the court's finding most of the state hospital population was transient. Plaintiffs have identified no evidence specifically indicating most of the population was transient. The court's finding was based on the testimony of a witness who was not certain about the average length of hospital stays. Further, uncontradicted testimony indicated 19 percent of San Mateo's state hospital patients were hospitalized for more than 10 years, 41 percent for more than 5 years, and 77 percent for at least 1 year.

In any event, in light of the historical inextricable linkage between allocations among counties of funding and state hospital beds, the superior court should have found reallocation of beds, including decreasing some counties' bed allocations, would adversely impact the treatment of existing patients. With respect to funding allocations, the superior court found the evidence demonstrated "the harmful effect of disrupting treatment of patients already on a treatment plan" and "the necessity of maintaining the level of care for individual patients." In determining the funding disparities were not unconstitutional, the court stated: "It is rational for the state to strive not to leave vulnerable citizens in a worse condition than they would

be in had they not been involved with state programs." The court should have reached similar conclusions about the historical disparities in bed allocations.

As the court properly found with respect to funding allocations, stability of programs was necessary to provide patients with a continuum of care. A stable continuum of care was crucial to mentally ill patients and their families. Both funding and bed allocations reflected historical choices made by counties about the means to provide a continuum of care to patients. State hospital beds were an integral part of many counties' programs. Bed reallocation would result in decreasing some counties' bed allocations. Such decreases would constitute reductions in those counties' base funding resulting in lost economic efficiency and value. Reducing such base funding would also adversely impact the continuum of care. Counties receiving decreased bed allocations would need to use funds otherwise spent on community programs to help those who would have been in state hospitals. Evidence indicated reducing the number of beds under reallocation would result in the loss of service to a large portion of mentally ill patients already receiving treatment. Moreover, ousting patients from beds would be traumatic.

In sum, the historically developed base level bed allocations were essential to ensuring the necessary continuum of care for existing individual patients. Not maintaining those bed allocations would disrupt the treatment and level of care for many patients. Thus, the superior court should have found the challenged bed allocations were rationally related to the legitimate state purpose of protecting patients from harm.

(3)

*Conclusion*

For many years state funding for county mental health programs and allocations to counties of state hospital beds have been directly linked. Beds and local dollars have been reciprocally convertible and fungible. Unequal distribution of state mental health resources resulted from counties' historical choices about participating in the Short-Doyle incentive matching grant program. The state has made adjustments to the mental health resource allocation system over time to begin to eliminate unreasonable inequalities. The disparities in bed allocations were not irrational simply because absolute equity had not been attained by the time of trial. The state defendants properly balanced the goals of maintaining existing local mental health programs, including state hospital bed allocations, and attempting to achieve equity among counties.

The superior court erred in determining there was no legitimate governmental purpose in maintaining a county's base allocation of state hospital beds. The record compels a conclusion the stability of patient care and program infrastructure was a legitimate governmental concern and the method used to allocate state hospital beds, including maintaining base allocations, was rationally related to providing such stability. The court should have determined the bed allocations did not violate equal protection guarantees. (Cf. *Nordlinger* v. *Hahn, supra,* __ U.S. at p. __ [120 L.Ed.2d at p. 14, 112 S.Ct. at p. 2333]; *City of Rancho Cucamonga* v. *Mackzum, supra,* 228 Cal.App.3d at p. 947.)

Similarly, the court erred in concluding allocation of state hospital beds violated substantive due process. The challenged governmental action was not arbitrary, unreasonable or unrelated to a legitimate state purpose. Where, as here, a legislative classification does not infringe upon a fundamental right, the test under the due process clause is "whether the classification bears a rational relation to a constitutionally permissible objective. [Citation.]" (*McCourtney* v. *Cory, supra,* 123 Cal.App.3d at p. 439.) Plaintiffs did not meet their burden to prove the classification was irrational. (*Armstrong* v. *County of San Mateo, supra,* 146 Cal.App.3d at p. 617, fn. 14.)

Accordingly, the portions of the judgment declaring the allocation of state hospital beds unconstitutional, ordering reallocation of beds, and granting injunctive relief against defendants must be reversed.

(C)

*Recovery of Damages for Funds Withheld for Bed Overuse*

Based upon its findings the under-equity state hospital bed allocations and the overuse charges for exceeding those limitations violated constitutional guarantees of equal protection and due process, the superior court concluded plaintiff counties were entitled to compensation for moneys the state withheld under former section 5700 et seq. from their Short-Doyle allocations for bed overuse.[42] Because we have concluded the bed allocations did not violate any equal protection or substantive due process rights of the counties,

---

[42]The judgment provided: "Plaintiffs have and recover from the state defendants the amount equal to the bed overuse charges imposed by the State less that amount which would have been charged had the bed-day allocations been based upon the poverty-population formula."

the portion of the judgment awarding damages for bed overuse charges must be reversed.[43]

(D)

*Mootness*

The realignment legislation enacted after trial but before entry of judgment revised the method of funding for county mental health services and discontinued Department allocation of community mental health funds and state hospital beds. (§§ 4330 et seq., 17600 et seq.; Stats. 1991, chs. 89 & 611.) Under realignment counties received funds from the state and could use that money to fund local programs or pay the Department for state hospital beds. Counties could purchase as many beds as they deemed necessary and wanted to buy. No county was allocated a fixed number of beds. Realignment also allocated portions of expected tax revenue growth for equity purposes. Some underequity counties also received additional adjustments. (§ 17600 et seq.) In July 1993 various aspects of realignment were amended. (Stats. 1993, ch. 100.)

" 'Repeal or modification of a statute [or ordinance] under attack, or subsequent legislation, may render moot the issues in a pending appeal.' [Citations.] It is also an established rule of law that on appeals from judgments granting or denying injunctions, the law to be applied is that which is current at the time of judgment in the appellate court [citations] because '[r]elief by injunction operates in futuro.' [Citations.]" (*Callie* v. *Board of Supervisors* (1969) 1 Cal.App.3d 13, 18-19 [81 Cal.Rptr. 440].) Defendants unsuccessfully argued to the superior court the realignment legislation had divested the court of jurisdiction to issue orders about allocations of local mental health funding and state hospital beds.

---

[43]Fresno plaintiffs contend the Department's failure to adopt regulations as required under the APA—independent of any constitutional violation—entitled plaintiff counties to a full refund of moneys withheld by the Department for bed overuse. The state defendants respond that any failure to promulgate regulations did not create a debt to the counties but instead created at most the basis for prospective relief. We reject as speculative Fresno plaintiffs' contention the APA violation could constitute a ground to uphold the damage award. The damage award for bed overuse charges was based only on the court's finding bed allocations were unconstitutional. Fresno plaintiffs have not demonstrated failure to promulgate regulations was the cause of any improper charge.

In light of our reversal of the damage award, we need not reach plaintiffs' contentions the superior court erred in not including in the judgment a specific dollar amount or prejudgment interest.

■   Defendants contend the trial court erred in not dismissing the litigation as moot. Defendants characterize realignment as fundamentally changing the allocation of mental health resources and thus rendering moot plaintiffs' claims.[44] Asserting plaintiffs challenged only the now superseded Short-Doyle Act allocation system, defendants contend various portions of the judgment involving constitutional and statutory issues should be reversed and dismissed as rendered moot by enactment of the realignment legislation substantially modifying the former statutory scheme.[45] Asserting the realignment legislation created an entirely new system for distributing state mental health funds to counties and ended the Department's allocation of funding and beds, defendants specifically characterize as moot the order directing reallocation of beds.[46] Defendants further claim the constitutionality of the old system is now irrelevant. However, even if we were to conclude the realignment legislation rendered moot the portions of the judgment involving the constitutionality of funding and bed allocations under the Short-Doyle system, ordering reallocation of beds and granting injunctive relief against defendants, the existence of the constitutionally based damage award would require us to resolve the constitutional issues.[47]

---

[44]According to the legislative analyst, "the state and local program realignment legislation enacted in 1991 represents a fundamental change in the state and county fiscal relationship." The legislative analyst noted such change had the two governmental purposes of "[a]llowing local governments greater flexibility in determining program structure and ultimate funding levels [that] would improve program services and their responsiveness to local concerns" and specifying "funding sources [that] would provide a stable and growing revenue base to support the programs over the long term." The legislative analyst also noted realignment provided counties with authority to make resource allocation decisions regarding mental health services.

[45]According to defendants, the realignment legislation created a bed allocation system independent of earlier allocations and transferred discretion about community funding away from the Department to other state officials. Defendants also characterize the realignment legislation as creating "a new statutory procedure by which funds will be distributed under new standards and without substantial discretion granted to the Department. (§§ 5701, 17600-17600.20.)"

[46]Defendants claim nothing in the realignment legislation requires allocation of state hospital beds based on historical usage. Further asserting under the realignment legislation state hospital beds are no longer allocated to counties but instead counties receive funds to provide local services or contract for the number of beds they desire, defendants contend the superior court's reallocation order cannot be implemented under the new statutory system. According to defendants, the Department is faced with implementing the realignment legislation or following a judgment based on superseded prior legislation.

[47]Plaintiffs contend the matter is not moot because the realignment legislation simply incorporated earlier inequitable mental health resource allocations and funded them from designated sources such as sales taxes and vehicle license fees. Plaintiffs assert the realignment legislation adopted "the long-standing discrimination in the allocation of mental health resources which was so fully explored at trial." Specifically, plaintiffs claim realignment contains the same assertedly unconstitutional elements as the Short-Doyle system, to wit, historically based discrimination with no rational relationship to relative poverty-population

(b)

*Promulgation of Regulations*

The state defendants also appeal the portion of the judgment ordering the Department to adopt regulations implementing former section 5600 as required under the APA. Defendants launch various attacks on the merits of the court's determination the APA required promulgation of such administrative regulations. Defendants claim no regulations were required.[48] Defendants also contend the realignment legislation has rendered moot the portion of the judgment ordering promulgation of regulations. We conclude that portion of the judgment is moot.

The superior court determined the Department violated the APA by not adopting various required regulations.[49] Specifically, the court found administrative regulations were required involving allocation of state hospital beds, restriction of hospital admissions without regard to bed availability or patient needs, collection of assessments for overuse of beds, allocation of available funds to counties, and various undefined terms.[50]

---

and no reasonable means to end such discrimination. According to plaintiffs, "realignment offers no better prospects of ending the unconstitutional discrimination than did the Short-Doyle system." Asserting realignment has perpetuated instead of remedied the discrimination, plaintiffs characterize this case as "even more ripe for a decision on the merits." Thus, plaintiffs ask us to declare realignment unconstitutional or remand the matter for superior court review of realignment's constitutionality. However, because the constitutionality of the realignment legislation's allocation method has not been litigated in the trial court, we decline plaintiffs' invitation to declare the new statutory scheme unconstitutional. Similarly, because these consolidated matters involved only the prior Short-Doyle program without litigating the realignment method, we also decline plaintiffs' alternative invitation to remand to the superior court for determination of the constitutionality of realignment.

[48]Defendants contend the Legislature did not direct the Department to promulgate regulations and the statutory shift of funds for bed overuse did not carry the requirement of regulations.

[49]The court noted the APA required the Department "to adopt regulations prior to implementing, interpreting or making specific any law enforced or administered by it or governing its procedure." (See Gov. Code, § 11342.)

[50]The court stated terms needing definition in regulations with respect to collection of assessments for bed overuse included "actual cost," "statewide average," and the "established policy of the department." The court also stated: "Among the required regulations are a definition of available funds, a definition of current base, a definition of equity, a definition of reasonable progress toward equity, a definition of county allocation, how relative need will be calculated ('poverty-population' is left undefined by Section 5600), how the relative needs and relative resources are to be taken into account and how the allocation formulas actually work. The latter is needed to determine whether there will be reasonable progress toward equity should the legislature find funds for DMH. DMH is required to adopt regulations concerning the allocation of categorical funds including those allocated under a competitive proposal formula."

As noted, the realignment legislation enacted after trial but before entry of judgment created a new method of funding for county mental health services and discontinued Department allocation of community mental health funds and state hospital beds. (§§ 4330 et seq., 17600 et seq.; Stats. 1991, chs. 89 & 611.) Under realignment a county was not allocated a fixed number of state hospital beds. Instead, counties received funds from the state for use to fund local programs or to contract for beds. Counties could purchase as many beds as they were willing to buy. Thus, realignment provided for distribution of funds under new standards without substantial Department discretion. (§§ 5701, 17600-17600.20.) According to defendants, by adopting specific standards removing the need for regulations, the realignment legislation rendered moot the court's order directing the Department to promulgate regulations. We agree. The superior court concluded regulations were required to implement the Short-Doyle Act and particularly former section 5600. However, the old system has been eliminated. Thus, the court's ruling involving promulgation of regulations is moot.

"Where an appeal is disposed of upon the ground of mootness and without reaching the merits, in order to avoid ambiguity, the preferable procedure is to reverse the judgment with directions to the trial court to dismiss the action for having become moot prior to its final determination on appeal. [Citations.]" (*Callie* v. *Board of Supervisors, supra,* 1 Cal.App.3d at p. 19; cf. *City of Los Angeles* v. *County of Los Angeles* (1983) 147 Cal.App.3d 952 [195 Cal.Rptr. 465].)[51] Accordingly, we reverse the portion of the judgment directing the Department to promulgate regulations and direct the superior court to dismiss as moot plaintiffs' claim under the APA.[52]

---

[51]In *City of Los Angeles* v. *County of Los Angeles, supra,* 147 Cal.App.3d 952, a city challenged the constitutionality of a county's allocation of property tax revenues. After entry of judgment favoring the city, the electorate enacted Proposition 13 changing the method of financing local government. In reversing the judgment the appellate court stated: "Since 1978, when this case was tried, the method of financing local government has undergone massive changes. Those changes, in our view, render this action moot. The post-Proposition 13 financing problems, sources of revenue and levels of expenditure understandably have not been adequately addressed in the pleadings or in the trial court. [¶] The facts upon which the judgment was rendered no longer are operative. The actual consequences of article XIII A were not presented to the trial court and are not in the record before us. To entertain this appeal would be to engage impermissibly in a purely academic exercise. We must therefore reverse the judgment with directions to the court to dismiss the proceeding as moot. [Citation.]" (*Id.* at p. 959.)

[52]Fresno plaintiffs and plaintiff interveners contend we should affirm the portion of the judgment ordering compliance with the APA because the realignment legislation assertedly also requires the Department to enact regulations. However, the challenged order in this litigation involved the need for regulations under the old resource allocation system, not under realignment.

We also note San Diego plaintiffs concede enactment of Senate Bill No. 463 in July 1993 has rendered moot the need for a regulation to define the term "current base."

## II

### Fresno Plaintiffs' Claim for
### Reimbursement for Treating Robert S.

#### A

#### Factual Background

Fresno's LPS conservatee Robert S. suffered an organic mental disorder.

From December 1986 until October 1987 Fresno unsuccessfully attempted several placements and treatment programs for Robert S.

On October 13, 1987, Fresno requested placement of Robert S. at Napa State Hospital (NSH) for psychiatric treatment.

On November 4, 1987, the Department denied Robert S. admission because of his alcohol problems. Fresno's administrative appeal was denied.

In March and September 1988 Robert S. was referred to NSH with a packet detailing his treatment needs and the propriety of placement at NSH. The Department continued to deny Robert S. admission on the ground of alcoholism.

After Robert S. was denied admission to NSH, Fresno contracted with a private psychiatric facility for an alternative and ultimately unsuccessful treatment program.

In June 1989 Robert S. was again referred to NSH and his admission denied.

On December 7, 1989, the Department admitted Robert S. to a specialized program at NSH after Fresno threatened litigation. Robert S. responded well to the program. The program was in existence for at least three years before Robert S.'s admission. .

Fresno spent $290,539.22 from its Short-Doyle allocation in attempting to place and treat Robert S. during the time he was denied admission to NSH.

B

## SUPERIOR COURT PROCEEDINGS

Fresno plaintiffs claimed the Department violated section 504 of the FRA by refusing to admit Robert S. to NSH.[53]

At trial Fresno plaintiffs presented evidence the $290,539.22 Short-Doyle money Fresno spent to care for Robert S. because of the Department's alleged FRA violation would have been spent to provide mental health services to other mentally ill Fresno residents. The Department did not claim an offset for state hospital charges or offer evidence disputing Fresno plaintiffs' damage claim. Fresno plaintiffs indicated the Department could claim an offset for state hospital charges leaving a net cost to Fresno of $197,881.99 to $272,400.29.

The trial court found alcoholism constituted a handicap under the FRA and the Department violated the statute in denying Robert S. admission to NSH from November 4, 1987, until December 7, 1989. However, the court denied Fresno plaintiffs' claim for reimbursement of money spent in treating Robert S. The court concluded Fresno plaintiffs failed to meet their burden to prove the amount to which they were entitled.[54]

C

## ANALYSIS

Asserting the superior court should not have imposed upon them the burden to prove the offset amount the Department could claim against their damages, Fresno plaintiffs contend the court erred in denying their damage claim for the Department's violating Robert S.'s rights under the FRA.

[53]Title 29 United States Code section 794(a), in 1989 provided in relevant part: "No otherwise qualified individual with handicaps in the United States, as defined in section 7(8) [29 USCS § 706(8)], shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance·. . . ." (Pub.L. No. 100-630 (Nov. 7, 1988) tit. II, § 206(d), 102 Stat. 3312.) We may refer to the statute as section 504 of the FRA due to its origin. (Pub.L. No. 93-112 (Sept. 26, 1973) tit. V, § 504, 87 Stat. 394.)

Title 29 United States Code section 794a(a)(2), provides: "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

[54]The court stated: "I understand that Fresno wants Robert S.'s money, and I haven't given it to them. . . . I didn't give Fresno money, because, although they told me how much they spent in taking care of Robert S., I have no idea how much money they would have spent in any event, absent the 504 violation, and I had no evidence."

Fresno plaintiffs contend after they presented substantial evidence of damages any remaining burden of proof rested on the state defendants. Fresno plaintiffs also contend they had standing on the three theories of the board of supervisors' representative standing on behalf of handicapped persons, individual taxpayers' standing to challenge illegal use of public funds under Code of Civil Procedure section 526a, and the standing of the county's health director and mental health director as public conservators for Fresno LPS conservatees. However, we affirm the portion of the decision denying Fresno plaintiffs recovery under the FRA because we conclude they lacked standing to prosecute that statutory claim.

Before trial, defendants challenged Fresno plaintiffs' standing. Believing itself bound by our opinion in *Miller* v. *Woods* (1983) 148 Cal.App.3d 862 [196 Cal.Rptr. 69], the superior court found Fresno plaintiffs had standing to assert the FRA claim based on Fresno's board of supervisors' representative standing and individual plaintiffs' taxpayer standing. However, we conclude neither the county, an individual member of its board of supervisors, a taxpayer nor an LPS conservator had a cause of action for damages for the benefit of the county based upon violation of Robert S.'s rights under the FRA.

As noted, Fresno plaintiffs included the County of Fresno, its director of health, its director of mental health and individual members of its board of supervisors as county officials and as taxpayers.[55] Fresno plaintiffs' original pleading sought declaratory, injunctive and extraordinary relief to redress the state defendants' alleged FRA violation in discriminatorily allocating state hospital beds to the county. At trial Fresno plaintiffs amended their complaint to add an allegation the state defendants' FRA violations included "denial of admission to Napa State Hospital from November 4, 1987 to December 7, 1989 of at least one individual which required Fresno Plaintiffs to divert from its local Short-Doyle monies a substantial amount of resources in attempting to have this individual treated and placed outside of the hospital setting. Fresno Plaintiffs are entitled to have their local Short-Doyle funds from State Defendants reimbursed by the amount of money which Fresno Plaintiffs had to expend in this effort to obtain treatment and placement for this patient." Fresno plaintiffs' amended complaint asked the superior court to "[o]rder State Defendants to reimburse . . . Fresno Plaintiffs for monies it [*sic*] expended for purposes of treatment and placement of

---

[55]The parties stipulated Fresno's health director had been "appointed as LPS conservator of the person of many residents of the County of Fresno who are gravely disabled as a result of a mental disorder." The parties also stipulated Fresno's health director and mental health director were "charged with authorizing individualized treatment, supervision, and placement for their LPS conservatees."

at least one individual who was denied access to a state hospital by State Defendants in violation of the Federal Rehabilitation Act of 1973."[56]

■ The state defendants contend Fresno plaintiffs did not have an express or implied cause of action against the Department under the FRA for damages for expenses incurred while the Department did not admit Robert S. into NSH. Asserting the FRA extended a cause of action only to the ultimate beneficiary subjected to discrimination by recipients of federal funds, the state defendants note Robert S. had a "colorable cause of action" but Robert S. did not sue. (29 U.S.C. § 794a(a)(2); 45 C.F.R. §§ 84.2, 84.3 (1992).)[57] Neither did Fresno plaintiffs sue for an award to Robert S.'s estate.[58] Instead, Fresno plaintiffs sought an award of damages which would inure to Fresno's general fund. According to the state defendants, Fresno plaintiffs lacked standing to sue on handicapped individual Robert S.'s behalf for benefits to the county. Thus, the state defendants conclude we should affirm the portion of the decision denying Fresno plaintiffs damages for any violation by the Department of Robert S.'s rights under the FRA. We agree.

The victim of any FRA violation based upon the state defendants' not admitting Robert S. into NSH was Robert S., not Fresno plaintiffs. (29 U.S.C. § 794(a).) However, as noted, Fresno plaintiffs sought damages not for Robert S. but rather for the county. Similarly, throughout the proceedings in superior court Fresno plaintiffs consistently sought damages for the county, not for Robert S.[59] Fresno plaintiffs continue to contend the appropriate remedy is awarding them monetary damages so they may provide

---

[56]We note the superior court determined Fresno plaintiffs had standing in December 1989, well before Fresno plaintiffs in January 1991 amended their complaint to allege a patient-specific claim for damages under section 504. At the hearing on the standing issue Fresno plaintiffs' counsel asked to amend the pleading by interlineation to allege the state defendants' allocation of state hospital beds violated section 504 of the FRA by unjustifiably discriminating against "disabled persons" instead of against "plaintiffs."

[57]Section 84.2 of 45 Code of Federal Regulations provided: "This part applies to each recipient of Federal financial assistance from the Department of Health and Human Services and to each program or activity that receives or benefits from such assistance."

Section 84.3(f), of 45 Code of Federal Regulations provided: "Recipient means any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance."

[58]In any event, the state defendants also contend "because Robert S. did not suffer any damages, the county can not claim that it is entitled to damages."

[59]For example, in their trial brief Fresno plaintiffs asserted the County of Fresno had the right to relief for the FRA section 504 violation involving Robert S. Fresno plaintiffs also asserted because of the Department's refusal to admit Robert S. to NSH, the county had to use substantial amounts of community Short-Doyle moneys to house and attempt to treat him

mental health services to county residents to substitute for mental health services they could not provide due to the state defendants' FRA violation which forced them to redirect limited mental health resources to attempt to meet Robert S.'s mental health needs. However, we decline to construe section 504 of the FRA as authorizing Fresno plaintiffs to seek such damages for the county.[60]

Fresno plaintiffs contend courts have granted relief to third parties when appropriate to help remedy a violation of the FRA. Although case law may indicate third parties can have standing to pursue declaratory, injunctive or extraordinary relief involving discrimination against individuals with handicaps, Fresno plaintiffs have not identified any case where such third parties were permitted to recover monetary damages for themselves. Our opinion in

locally; those moneys would have otherwise gone to treat other mentally ill residents; and restoration of those moneys to the county would thus be an appropriate remedy.

In their closing brief Fresno plaintiffs asserted the state defendants' refusal to admit Robert S. to NSH before December 1989 resulted in the diversion of $290,539.22 in local mental health funds to attempt to treat Robert S.; and ordering the state to pay that sum of money back to the county to use for additional mental health services would allow county residents "to receive the benefits of these monies which they previously were prohibited from doing due to the State's violation of Section 504." Fresno plaintiffs thus asked the court to order the state defendants to pay the county $290,539.22 less an offset "as reimbursement for monies expended by Fresno County in attempting to treat Robert S. during the period of time that the State unlawfully refused to admit Robert S. to Napa State Hospital."

In an additional closing brief Fresno plaintiffs asserted the "damages sustained by Plaintiff County of Fresno due to this specific Section 504 violation totalled [sic] $290,539.22." Seeking a judgment ordering the Department "to reimburse the County of Fresno the money specified above" less an appropriate offset, Fresno plaintiffs asserted upon being awarded damages the county would use the money "to benefit its local residents who need mental health services."

In objecting to the proposed statement of decision and proposed judgment, Fresno plaintiffs asserted: "If a consequence of the State's violation of Section 504 of the Federal Rehabilitation Act of 1973 is that a county is forced to expend some of its Short-Doyle monies in a way which reduces the county's ability to provide other mental health services, then, a fortiori, the county and its residents are damaged by the loss of use of that amount of money." Thus, according to Fresno plaintiffs, the judgment should award damages to the "County of Fresno."

[60]Perhaps recognizing their standing claim to be tenuous, Fresno plaintiffs alternatively claim entitlement as third party beneficiaries under their contract with state defendants. Fresno plaintiffs also suggest if damages may be awarded only to benefit Robert S. directly, the court should fashion a remedy awarding them damages to be held in trust to provide mental health services to Robert S. However, at this late date Fresno plaintiffs may not change their theories of recovery.

Similarly, Fresno plaintiffs contend at a minimum their public conservators had standing to pursue Robert S.'s interests since the conservators were charged with "directly or indirectly" providing "services designed for the financial and personal protection of [the conservatee]" (Cal. Code Regs., tit. 9, § 548) and had authority to "[c]ommence and maintain actions and proceedings for the benefit of the . . . conservatee" (Prob. Code, § 2462). However, at trial Fresno plaintiffs sought damages for the county, not for Robert S.

*Miller* v. *Woods, supra,* 148 Cal.App.3d 862, relied upon by the superior court, does not help Fresno plaintiffs. *Miller* involved claims by various individuals and organizations for declaratory, injunctive and extraordinary relief to invalidate a state regulation as violating section 504 of the FRA. We find nothing in *Miller* authorizing a third party to recover damages for a violation for another individual's rights under FRA section 504.

In sum, we conclude Fresno plaintiffs lacked standing to pursue the FRA claim. Accordingly, we affirm the portion of the court's decision denying Fresno plaintiffs damages for any violation by the Department of Robert S.'s rights under the FRA.[61]

### III

### THE DIRECTOR'S PETITION FOR EXTRAORDINARY RELIEF

### A

### FACTUAL AND PROCEDURAL BACKGROUND

The Director notified Fresno realignment required the county to contract for its LPS state hospital beds. (§ 4331.)

Fresno plaintiffs asked the superior court to hold the Director in contempt on the ground the preliminary injunction—issued October 17, 1989, as interpreted by the court on December 14, 1989, and perpetuated in the August 8, 1991, judgment—required the Director to provide all counties free of charge any bed usage over the fiscal year 1987-1988 allocation up to their 1988-1989 usage.

On January 21, 1993, the court issued a written order holding the Director in contempt.

The Director seeks extraordinary relief.

### B

### ANALYSIS

Preliminarily, we note the Director faced the dilemma of implementing the mandates of the new realignment legislation or following a judgment

---

[61]In light of our determination Fresno plaintiffs lacked standing to prosecute the FRA claim, we do not reach Fresno plaintiffs' contention of court error in allocating the burden to prove the amount of any offset.

based on prior legislation. (§ 4331.) The judgment and the contempt order could not be implemented under the new statutory scheme because the realignment legislation provided that state hospital beds would no longer be allocated to counties by the Department.

In any event, the contempt proceedings arose out of the injunctive relief portions of the judgment including those continuing in existence the preliminary injunctions involving state hospital bed allocations and bed overuse charges. However, as discussed above, we have reversed those portions of the judgment granting injunctive relief because they were based on the superior court's erroneous conclusion the bed allocation system was unconstitutional. Thus, the grounds for the contempt proceedings have become moot. Accordingly, we grant the Director's petition for extraordinary relief, directing the superior court to vacate its order finding the Director in contempt and dismiss the contempt proceedings as moot.

## DISPOSITION

The portion of the judgment declaring the Short-Doyle funding allocation system constitutional is affirmed. The portions of the judgment declaring the Short-Doyle state hospital bed allocation system unconstitutional, ordering reallocation of beds, granting injunctive relief against defendants, and awarding plaintiff counties damages are reversed with directions to the superior court to enter judgment for defendants on those issues. The portions of the judgment involving violations of former Welfare and Institutions Code section 5600 and ordering the Department to promulgate regulations under the Administrative Procedure Act are reversed with directions to the superior court to dismiss as moot plaintiffs' claims bearing on those issues. The portion of the decision denying Fresno plaintiffs recovery under the federal Rehabilitation Act of 1973 is affirmed.

Let a writ of mandate issue directing the superior court to vacate its order finding the Director in contempt and dismiss the contempt proceedings as moot.

The parties shall bear their own costs on appeal.

Work, J., and Todd, J., concurred.

A petition for a rehearing was denied November 15, 1993, and the petitions of all plaintiffs and appellants for review by the Supreme Court were denied January 13, 1993. Mosk, J., was of the opinion that the petitions should be granted.